### UNITED STATES v. PARAMOUNT PICTURES, Inc., et al.

District Court, S. D. New York.

Dec. 31, 1946.

As Modified Feb. 3, 1947.

Simpson, Thacher & Bartlett, of New York City, for defendant Paramount.

Davis, Polk, Wardwell, Sunderland & Kiendl, of New York City, for defendant Loew's.

Donovan, Leisure, Newton, Lumbard & Irvine, of New York City, for defendant RKO.

Joseph M. Proskauer, of New York City, for defendant Warner.

Dwight, Harris, Koegel & Caskey, of New York City, for defendant 20th Century Fox.

Before AUGUSTUS N. HAND, Circuit Judge, and GODDARD and BRIGHT, District Judges.

This action having been duly tried and the proofs and arguments of the respective parties having been duly heard and considered, this court, having filed its opinion herein dated June 11, 1946, 66 F.Supp. 323, does hereby find and decide as follows:

### Findings of Fact

1. The following are definitions of terms used in these findings and in the judgment to be entered hereon:

Block-booking—The practice of licensing, or offering for license, one feature, or group of features, upon condition that the exhibitor shall also license another feature or group of features released by the distributor during a given period.

Clearance—The period of time, usually stipulated in license contracts, which must elapse between runs of the same feature within a particular area or in specified theatres.

Exchange District—An area in which an office is maintained by a distributor for the purpose of soliciting license agreements for the exhibition of its pictures in theatres situated throughout the territory served by the exchange and for the physical distribution of such films throughout this territory.

Feature—Any motion picture, regardless of topic, the length of the film of which is in excess of 4,000 feet.

Formula Deal—A licensing agreement with a circuit of theatres in which the license fee of a given feature is measured for the theatres covered by the agreement by a specified percentage of the feature's national gross.

Franchise—A licensing agreement, or series of licensing agreements, entered into as part of the same transaction, in effect for more than one motion picture season and covering the exhibition of features released by one distributor during the entire period of the agreement.

Independent—A producer, distributor, or exhibitor, as the context requires, which is not a defendant in this action or a subsidiary or affiliate of a defendant.

Master Agreement—A licensing agreement, also known as a "blanket deal", covering the exhibition of features in a number of theatres, usually comprising a circuit.

Motion Picture Season—A one-year period beginning about September 1 of each year.

Road-show—A public exhibition of a feature in a limited number of theatres, in advance of its general release, at admission prices higher than those customarily charged in first-run theatres in the areas where they are located.

Runs—The successive exhibitions of a feature in a given area, first-run being the first exhibition in that area, second run being the next subsequent, and so on, and shall include also successive exhibitions in different theatres, even though such theatres may be under a common ownership or management.

Trade-Showing—A private exhibition of a feature prior to its release for public exhibition.

2. Paramount Pictures, Inc., is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 1501 Broadway, New York, New York, and is engaged in the business of producing, distributing, and exhibiting motion pictures, either directly or through subsidiary or associated companies, in various parts of the United States and in foreign countries.

3. Paramount Film Distributing Corporation, a wholly owned subsidiary of Paramount Pictures, Inc., is a corporation organized and existing under the laws of the State of Delaware, with a place of business at 1501 Broadway, New York, New York, and is engaged in the distribution branch of the industry.

4. In 1916 or 1917, a group of exhibitors which controlled many of the then best theatres throughout the country organized First National Exhibitors Circuit Inc. Although this corporation was initially organized to function as a film buying combine, it evolved into a film producing company first by financing the production of pictures by others for exhibition in the theatres of its members and finally by producing its own motion pictures.

5. The members of this First National group, consisting of many of the most important exhibitors in the United States controlling many of the best theatres, became franchise holders of the distributing company which they formed. They acquired not only the right to exhibit in their own theatres the pictures produced and distributed by First National, but also they each obtained the right to subfranchise other exhibitors in their respective territories. In a short time there were some 3500 franchise holders, representing as many or more theatres.

6. First National soon began to negotiate for the services of well-known stars and directors in the employ of other producers, including Paramount, and the members of First National began to refuse to exhibit Paramount films. Such well known stars as Mary Pickford and Norma Talmadge went over to the First National Group.

7. Many of the theatres owned by members of First National had, for a long time prior to 1918, exhibited Paramount pictures. The formation and growth of First National gradually cut down the number of Paramount pictures exhibited in the theatres of the First National group. By 1919 Paramount faced a situation where a group of owners of many of the best theatres in the large cities, many of whom had been its customers in the past, had combined together for co-operative buying and had expanded into a strong organization which distributed its own pictures and threatened to supply its members with enough pictures to permit them to operate without using any pictures of other producers, including Paramount.

8. In these circumstances Paramount determined to acquire interests in theatres of its own so that it might assure itself of outlets for Paramount productions. Prior to the fall of 1917 Paramount had no theatre interests. Between 1917 and 1919 it acquired an interest in two theatres in New York City as show windows, to replace the Strand Theatre which had gone over to the First National Group. During that year in conjunction with its representative in the South, it formed Southern Enterprises, Inc., which acquired various theatres in the South. At about the same time Paramount acquired a 50% interest in the Black chain of theatres in New England.

9. In January, 1932, Paramount went into equity receivership in the United States District Court for the Southern District of New York. It stayed in equity receivership until March, 1933, when it went into voluntary bankruptcy. It remained in bankruptcy until June, 1934, when upon passage of Section 77B of the Bankruptcy Law, 11 U.S.C.A. § 207, it petitioned for reorganization. It was finally reorganized under its present name in June, 1935. During these years various companies operating theatres in which Paramount was interested were themselves the subject of bankruptcy or receivership proceedings.

10. Some of the theatre interests which Paramount held at the time of the trial of this action had been acquired and were wholly owned by it either directly or indirectly through subsidiary companies prior to its bankruptcy and reorganization. In the course of its reorganization, some of its partly owned theatre interests were created, i. e., in some instances the plan of reorganization approved by this court provided for the sale or other disposition by Paramount of a partial interest (sometimes amounting to 50%, sometimes more and sometimes less) in theretofore wholly owned theatre operating companies, or companies holding legal or equitable interests in theatres or theatre operating companies. The result was the creation of many of Paramount's present partly owned theatre interests.

11. In the course of the reorganization proceedings Paramount lost its interests in some theatres and also changed its relationship with respect to interests in some of its theatre operating companies. The effect of these proceedings and the policy of decentralization inaugurated in the course thereof, was that in some instances Paramount disposed of a partial interest in companies theretofore wholly owned.

12. Loew's Incorporated is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1540 Broadway, New York, New York, and is engaged in the business of producing, distributing, and exhibiting motion pictures, either directly or through subsidiary or associated companies, in various parts of the United States and in foreign countries.

13. Radio-Keith-Orpheum Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1270 Sixth Avenue, New York, New York, and is engaged in the business of producing, distributing, and exhibiting motion pictures, either directly or through subsidiary or associated corporations, in various parts of the United States and in foreign countries.

14. RKO Radio Pictures, Inc., a wholly owned subsidiary of Radio-Keith-Orpheum Corporation, is a corporation organized and existing under the laws of the State of Delaware, with a place of business at 1270 Sixth Avenue, New York, New York, and is engaged in the production and distribution branch of the industry.

15. Keith-Albee-Orpheum Corporation was a corporation organized and existing under the laws of the State of Delaware, with a place of business at 1270 Sixth Avenue, New York, New York, and was engaged in the business of exhibiting motion pictures prior to its dissolution on September 29, 1944. Approximately 99% of its common stock and 33% of its preferred stock were held by Radio-Keith-Orpheum Corporation.

16. RKO Proctor Corporation, a wholly owned subsidiary of Radio-Keith-Orpheum Corporation is a corporation organized and existing under the laws of the State of New York, with a place of business at 1270 Sixth Avenue, New York, New York, and is engaged in the business of exhibiting motion pictures.

17. RKO Midwest Corporation, a wholly owned subsidiary of Radio-Keith-Orpheum Corporation, is a corporation organized and existing under the laws of the State of Ohio, with a place of business at 1270 Sixth Avenue, New York, New York, and is engaged in the business of exhibiting motion pictures.

18. RKO was organized in 1928 by Radio Corporation of America largely for the purpose of obtaining an effective means of developing the use of its motion picture sound recording and reproduction devices in the motion picture production and exhibition fields.

19. At the time of its organization, RKO secured production and distribution facilities by merger with a small company, FBO Productions, Inc., which had limited production facilities and a national distributing organization. RKO invested substantial sums to modernize these facilities.

20. The formation of RKO introduced a new and substantial competitive factor in the production and distribution of motion pictures.

21. During its initial organizational period, RKO acquired interests in a number of companies operating circuits of vaudeville theatres.

22. RKO went into receivership in 1933 and continued in receivership and reorganization until 1940. At the time of its receivership RKO operated considerably more theatres than its present total of 106. During the receivership it lost 57 theatres.

23. The organization of RKO did increase competition in each of the three branches of the industry.

24. Warner Bros. Pictures, Inc., is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 321 West 44th Street, New York, New York, and is engaged in the business of producing, distributing, and exhibiting motion pictures, either directly or through subsidiary or associated companies, in various parts of the United States and in foreign countries.

25. On April 4, 1923, the four Warner brothers, Harry M., Jack L., Albert, and Sam, transferred their business of production and distribution of motion pictures to a corporation known as Warner Bros. Pictures, Inc., (hereinafter referred to as Warner).

26. Beginning in 1925, Warner began the work of developing sound pictures under license and agreements from Western Electric, culminating in the production of such sound pictures as "The Jazz Singer", starting Al Jolson, in October, 1927, and the first 100% talking picture "The Lights of New York" in the summer of 1928.

27. The Stanley Company of America had in 1928 and for a year prior thereto about 250 theatres situated principally in and around Pennsylvania and New Jersey.

28. Negotiations were begun with the view of exchanging stock of Warner for the stock of Stanley Company of America. This transaction was consummated late in 1928.

29. With the acquisition of the stock of Stanley Company of America, Warner acquired 250 theatres which could be immediately equipped with sound installation.

30. In the year and nine months immediately following the acquisition of the stock of Stanley Company of America, Warner secured in a similar fashion several other circuits of theatres owning theatres in the same general locality and a smaller number of theatres scattered in various other parts of the country.

31. In 1931 Warner had an interest in 591 theatres, the largest number of theatres in which Warner has ever had an interest.

32. Today, the Warner companies have an interest in 547 theatres—a net reduction of 44 from its peak holdings of 591 in 1931.

33. First National Pictures, Inc., a corporation engaged in the production and distribution of silent motion pictures, had been organized as far back as 1917 by approximately 24 exhibitors on a cooperative basis for the basis of acquiring film of first quality for exhibition in their own theatres, as well as for distribution by them for other theatres in the respective territories in which they operated.

34. In 1928 Stanley Company of America owned one-third of the stock of First National Pictures, Inc., all the stock of First National Pictures, Inc., being subject to a voting trust.

35. Warner acquired as part of the Stanley Company of America transaction in 1928, one-third of the stock of First National Pictures, Inc.

36. At or about the time of the acquisition of the Stanley Company of America stock, or shortly thereafter, Warner purchased another one-third of the stock of First National Pictures, Inc., from other First National Pictures, Inc., stockholders.

37. Subsequently, in 1929, Warner acquired the remaining one-third of the stock of First National Pictures, Inc., from defendant, Twentieth Century-Fox.

38. Vitagraph, Inc., a wholly owned subsidiary of Warner Bros. Pictures, Inc., is a corporation organized and existing under the laws of the State of New York, with a place of business at 321 West 44th Street, New York, New York, and is engaged in the business of distributing motion pictures. On July 20, 1944, its name was changed to Warner Bros. Pictures Distributing Corporation.

39. Warner Bros. Circuit Management Corporation, a wholly owned subsidiary of Warner Bros. Pictures, Inc., is a corporation organized and existing under the laws of the State of New York, with a place of business at 321 West 44th Street, New York, New York, and, among other things, acts as booking agent for the exhibition interests of the said Warner Bros. Pictures, Inc.

40. Twentieth Century-Fox Film Corporation is a corporation organized and existing under the laws of the State of New York, having its principal place of business at 444 West 56th Street, New York, New York, and is engaged in the business of producing, distributing, and exhibiting motion pictures, either directly or through subsidiary or associated companies, in various parts of the United States and in foreign countries.

41. Twentieth Century-Fox produces its features in its own studio in Los Angeles, California, distributes them in this country through thirty-one branches or exchanges which it operates in the principal centers of population, and licenses its features for exhibition in its own and other theatres.

42. Twentieth Century-Fox acquired its initial interest in theatres through the purchase of stock in corporations then engaged in operating theatres. Since such original acquisition, it has acquired additional interests in theatres, some of which were acquired in competition with other defendants and with independent circuits and some of which are new theatres constructed by it.

43. National Theatres Corporation is owned and controlled by Twentieth Century-Fox Film Corporation, and is a corporation organized and existing under the laws of the State of Delaware, with a place of business at 2854 Hudson Boulevard, Jersey City, New Jersey, and is a holding company for the theatre interests of the said Twentieth-Century-Fox Film Corporation.

44. Columbia Pictures Corporation is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 729 Seventh Avenue, New York, and is engaged in the business of producing and distributing motion pictures, either directly or through subsidiary or associated companies, in various parts of the United States and in foreign countries.

45. Screen Gems, Inc., a wholly owned subsidiary of Columbia Pictures Corporation, is a corporation organized and existing under the laws of the State of California, with a place of business at 700 Santa Monica Boulevard, Hollywood, California, and is engaged in the business of producing motion pictures.

46. Columbia Pictures of Louisiana, Inc., a wholly owned subsidiary of Columbia Pictures Corporation, is a corporation organized and existing under the laws of the State of Louisiana, with a place of business at 150 South Liberty Street, New Orleans, Louisiana, and is engaged in the business of distributing motion pictures.

47. Universal Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1250 Sixth Avenue, New York, New York, and is engaged in the business of producing and distributing motion pictures, either directly or through subsidiary or associated corporations, in various parts of the United States and in foreign countries. On May 25, 1943, its name was changed to Universal Pictures Company, Inc., when a subsidiary of the same name was merged into it, but Universal Corporation was the surviving corporation.

48. The corporation named in the complaint as Universal Pictures Company, Inc., was a subsidiary corporation controlled by Universal Corporation, which was engaged in the business of producing motion pictures, prior to its merger into Universal Corporation on May 25, 1943.

49. Universal Film Exchanges, Inc., a wholly owned subsidiary of Universal Corporation, is a corporation organized and existing under the laws of the State of Delaware, with a place of business at 1250 Sixth Avenue, New York, New York, and is engaged in the business of distributing motion pictures.

50. The Universal group of defendants at the time of the trial consisted of the following corporations: (1) Universal Pictures Company, Inc. (hereinafter sometimes called Universal Pictures), a Delaware Corporation with its principal office in New York, N. Y., engaged in the business of producing motion pictures and distributing the same through wholly-owned subsidiaries; (2) Universal Film Exchanges, Inc. (hereinafter sometimes called Universal Film Exchanges), a Delaware corporation, with its principal office in New York, N. Y., engaged in the business of distributing motion pictures throughout the United States (except for the Metropolitan District of New York City), a wholly-owned subsidiary of Universal Pictures; (3) Big U Film Exchange, Inc. (hereinafter sometimes called Big U), a New York corporation, with its principal office in New York, N. Y., engaged in the business of distributing motion pictures throughout the Metropolitan District of New York City, a wholly-owned subsidiary of Universal Pictures. The term "Universal" as used herein means any or all of the Universal defendants.

51. Prior to May 25, 1943, the name of Universal Pictures Company, Inc., was Universal Corporation, incorporated in Delaware in 1936. It owned approximately 92% of the outstanding common stock of a Delaware corporation which was incorporated in the year 1925 and was also known as Universal Pictures Company, Inc. Said corporation last named had its principal office in New York, N. Y., and was engaged in the business of producing motion pictures and distributing the same through its subsidiaries. It owned all of the outstanding stock of Universal Film Exchange, Inc., and 20% of the outstanding common stock of Big U Film Exchange, Inc. The other 80% of said stock was owned by Universal Corporation. On May 25, 1943, Universal Pictures Company, Inc. (Delaware, 1925) was merged into Universal Corporation (the surviving corporation), and the name of the surviving corporation was changed to Universal Pictures Company, Inc.

52. Big U Film Exchange, Inc., a wholly owned subsidiary of Universal Corporation, is a corporation organized and existing under the laws of the State of New York, with a place of business at 1250 Sixth Avenue, New York, New York, and is engaged in the business of distributing motion pictures.

53. United Artists Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 729 Seventh Avenue, New York, New York, and is engaged in distribution of motion pictures in various parts of the United States and in foreign countries.

54. During the entire period in question United Artists Corporation distributed photoplays in the United States of America that were produced by David O. Selznick, Mary Pickford, Charles Chaplin, Hunt Stromberg, William Cagney, Bing Crosby, Edward Small, Sol Lesser, Lester Cowan, Jack Skirball, Benedict Bogeaus, Seymour Nebenzal, Jules Levey, David Loew, Arnold Pressburger, Charles R. Rogers, Andrew Stone, Constance Bennet, Howard Hughes, Preston Sturgis, J. Arthur Rank, Edward Golden, or corporations with which the aforesaid individuals were associated and other independent producers.

55. United Artists Corporation maintains 26 branches or exchanges located throughout the United States, and through these facilities it distributes and has distributed all of the product handled by it during the period in question.

56. Paramount Pictures, Inc.; Loew's Incorporated; Radio-Keith-Orpheum Corporation; Warner Bros. Pictures, Inc.; and Twentieth Century Fox Film Corporation and their respective distribution and exhibition subsidiaries are the five major defendants.

57. As between the eight defendants, Paramount, Loew's, Fox, RKO, Warner, Columbia, United Artists and Universal, there are no officers or directors in common, and none of said defendants owns any controlling stock or other securities in any other of said defendants.

58. Neither of the defendants Columbia, Universal and United Artists owns any theatres.

59. There exists active competition among the defendants and others in the production of motion pictures.

60. None of the defendants has monopolized or attempted to monopolize or contracted or combined or conspired to monopolize or to restrain trade or commerce in any part of the business of producing motion pictures.

61. In the distribution of feature motion pictures no film is sold to the exhibitor; the right to exhibit under copyright is licensed.

62. In licensing features, each of the distributor defendants has agreed with each of its respective licensees that the licensee should charge no less than a stated admission price during the exhibition of the feature licensed.

63. The minimum admission prices included in licenses of each of the eight distributor-defendants for any given theatre are in general uniform, being the usual admission prices currently charged by the exhibitor.

64. The defendants' licenses are in effect price-fixing arrangements among all of the distributor-defendants, as well as between such defendants individually and their various exhibitors. Thus there was a general arrangement of fixing prices in which both the distributors and exhibitors were involved. The licenses required existing admission price schedules to be maintained under severe penalties for infraction. In the case of such exceptional features as "Gone With The Wind", "For Whom The Bell Tolls", "Wilson", and "Song of Bernadette", licensed for exhibition prior to general release and as to which the distributors were not satisfied with current prices, they would refuse to grant licenses unless the prices were raised.

65. The defendants granting film licenses have agreed with their licensees to a system which determines minimum admission prices in all theatres where feature motion pictures licensed by them are exhibited. In this way are controlled the prices to be charged for most of the feature motion pictures exhibited either by the defendants or by independents within the United States.

66. All of the five major defendants have a definite interest in keeping up prices in any given territory in which they own theatres and this interest they were safeguarding by fixing minimum prices in

their licenses when distributing films to exhibitors in those areas. Even if the licenses were at flat rate, a failure to require their licensees to maintain fixed prices would leave them free for lowering the current charge to decrease through competition the income to the licensor on theatres in the neighborhood. The whole system presupposed a fixing of prices by all parties concerned in all competitive areas. There exists great similarity, and in many cases identity, in the minimum prices fixed for the same theatres in the licenses of all of the defendants.

67. The major defendants made operating agreements as exhibitors with each other and with independent exhibitors in which joint operation of certain theatres covered by the agreements is provided and minimum admission prices to be charged are either stated therein or are to be jointly determined by other means. These agreements show the express intent of the major defendants to maintain prices at artificial levels.

68. Certain master agreements and franchises between various of the defendants in their capacities as distributors and various of the defendants in their capacities as exhibitors stipulate minimum admission prices often for dozens of theatres owned by an exhibitor-defendant in a particular area in the United States.

69. Licenses granted by one defendant to another disclose the same inter-relationship among the defendants. Each of the five major defendants as an exhibitor has been licensed by the other seven defendants as distributors to exhibit the pictures of the latter at specified minimum admission prices. RKO, Loew's, Warner, Paramount, and Fox, in granting and accepting licenses with minimum admission prices specified, have among themselves engaged in a national system to fix prices, and Columbia, Universal, and United Artists, in requiring the maintenance of minimum admission prices in their licenses granted to these exhibitor-defendants, have participated in that system.

70. The distributor-defendants have acquiesced in the establishment of a price-fixing system and have conspired with one another to maintain prices.

71. In agreeing to maintain a stipulated minimum admission price, each exhibitor thereby consents to the minimum price level at which it will compete against other licensees of the same distributor whether they exhibit on the same run or not. The total effect is that through the separate contracts between the distributor and its licensees a price structure is erected which regulates the licensees' ability to compete against one another in admission prices. Each licensee knows from the general uniformity of admission price practices that other licensees having theatres suitable for exhibition of a distributor's feature in the particular competitive area will also be restricted as to maintenance of minimum admission prices, and this acquiescence of the exhibitors in the distributor's control of price competition renders the whole a conspiracy between each distributor and its licensees. An effective system of price control in which the distributor and its licensees knowingly take part by entering into price-restricting contracts is thereby erected.

72. The differentials in admission price set by a distributor in licensing a particular feature in theatres exhibiting on different runs in the same competitive area are calculated to encourage as many patrons as possible to see the picture in the prior-run theatres where they will pay higher prices than in the subsequent runs. The reason for this is that if 10,000 people of a city's population are ultimately to see the feature—no matter on what run— the gross revenue to be realized from their patronage is increased relatively to the increase in numbers seeing it in the higher-priced prior-run theatres. In effect, the distributor, by the fixing of minimum admission prices, attempts to give the prior-run exhibitors as near a monopoly of the patronage as possible.

73. Among the provisions common to the licensing contracts of all the distributor-defendants are those by which the licensor agrees not to exhibit or grant a

license to exhibit a certain feature motion picture before a specified number of days after the last date of the exhibition therein licensed. This so-called period of "clearance" or "protection" is stated in the various licenses in differing ways; in terms of a given period between designated runs; in terms of admission prices charged by competing theatres; in terms of a given period of clearance over specifically named theatres; in terms of so many days' clearance over specified areas or towns; in terms of clearances as fixed by other distributors; or in terms of combinations of these formulae.

74. The cost of each black and white print is from $150 to $300, and of a technicolor print is from $600 to $800. Many of the bookings are for less than the cost of the print so that exhibitions would be confined to the larger high-priced theatres unless a system of successive runs with a reasonable protection for the earlier runs is adopted in the way of clearance.

75. Without regard to period of clearance, licensing features for exhibition on different successive dates is essential in the distribution of feature motion pictures.

76. Either a license for successive dates, or one providing for clearance, permits the public to see the picture in a later exhibiting theatre at lower than prior rates.

77. A grant of clearance, when not accompanied by a fixing of minimum admission prices or not unduly extended as to area or duration affords a fair protection of the interest of the licensor in the rental to be derived from the exhibition of the feature licensed, without unreasonably interfering with the interest of the public.

78. Clearance, reasonable as to time and area, is essential in the distribution and exhibition of motion pictures. The practice is of proved utility in the motion picture industry and necessary for the reasonable conduct of the business.

79. The major defendants have acquiesced in and forwarded a uniform system of clearances and in numerous instances have maintained unreasonable clearances to the prejudice of independents.

80. Some licenses granted clearance to all theatres which the exhibitor party to the contract might thereafter own, lease, control, manage, or operate against all theatres in the immediate vicinity of the exhibitor's theatre thereafter erected or opened. The purpose of this type of clearance agreements was to fix the run and clearance status of any theatre thereafter opened not on the basis of its appointments, size, location, and other competitive features normally entering into such determination, but rather upon the sole basis of whether it were operated by the exhibitor party to the agreement.

81. The distributor-defendants have acted in concert in the formation of a uniform system of clearance for the theatres to which they license their films and the exhibitor-defendants have assisted in creating and have acquiesced in this system.

82. The defendants have acted in concert in their grants of run and clearance.

83. Clearances are given to protect a particular run against a subsequent run and the practice of clearance is so closely allied with that of run as to make findings on the one applicable to the other.

84. Both independent distributors and exhibitors, when attempting to bargain with the defendants, have been met by a fixed scale of clearances, runs, and admission prices to which they have been obliged to conform if they wished to get their pictures shown upon satisfactory runs or were to compete in exhibition either with the defendants' theatre or theatres to which the latter had licensed their pictures.

85. Competition can be introduced into the present system of fixed admission prices, clearances, and runs, by requiring a defendant-distributor when licensing its features to grant the license for each run at a reasonable clearance (if clearance is involved) to the highest bidder, if such bidder is responsible and has a theatre of a size, location, and equipment adequate to yield a reasonable return to the licensor. In other words, if two theatres are bidding and are fairly comparable, the one offering the best terms shall receive the license. Thus, price fixing among the licensors or between a licensor and its licensees as well as the non-competitive clearance system may be terminated.

86. Formula deals have been entered into by Paramount and by RKO with independent and affiliated circuits. The circuit may allocate playing time and film rentals among the various theatres as it sees fit. Arrangements whereby all the theatres of a circuit are included in a single agreement, and no opportunity is afforded for other theatre owners to bid for the feature in their several areas, seriously and unreasonably restrain competition.

87. Loew's is not, and never has been, a party either as a distributor or as an exhibitor, to any "formula deal" license agreements.

88. Master agreements which cover exhibition in two or more theatres in a particular circuit and allow the exhibitor to allocate the film rental paid among the theatres as it sees fit and also to exhibit the features upon such playing time as it deems best and leaves other terms to the circuit's discretion, have been entered into by the distributor defendants and unreasonably restrain trade.

89. Franchises have been entered into by the distributor defendants, and unreasonably restrain trade, because they cover too long a period (more than one season), and also because they embrace all the features released by a given distributor.

90. Loew's today has outstanding no franchise agreements for any theatre in which it does not have an interest, and Loew's is not currently granting franchises. During its entire history Loew's, as a distributor, granted a total of 213 franchises, of which 154 were to independent theatres and only 59 to those in which any other producer-exhibitor had an interest.

91. Twentieth Century-Fox has not granted any franchises since June 6, 1940. In 1938–39, the motion picture season in which Twentieth Century-Fox had the greatest number of franchises outstanding, there were 400. Of these, 361 were with independent exhibitors.

92. During the period in question Universal entered into franchise agreements with 727 independent exhibitors and 43 affiliated exhibitors.

93. Block-booking, when the license of any feature is conditioned upon taking of other features, is a system which prevents competitors from bidding for single features on their individual merits.

94. For many years the distributor defendants, except United Artists Corporation, licensed their films in "blocks", or indivisible groups, before they had been actually produced. In such cases the only knowledge prospective exhibitors had of the films which they had contracted for was from a description of each picture by title, plot and players. In many cases licenses for all the films had to be accepted in order to obtain any, though sometimes the exhibitor was given a right of subsequent cancellation for a certain number of pictures. Because of complaints of block booking and blind-selling based upon the supposed unfairness of contracts which often includes pictures the inferior quality of which could not be known, Sections III and IV of the consent decree required the five consenting distributors to trade-show their films before offering them for license and limited the number which might be included in any contract to five. More than one block of five, however, could be licensed where the contents of any had been trade-shown. While this restriction in the consent decree has now ceased by time limitation, the consenting distributors have continued to observe the restriction. The non-assenting distributors have retained up to the present time their previous methods of licensing in blocks, but have allowed their customers considerable freedom to cancel the license as to a percentage of the pictures contracted for.

95. United Artists did not at any time license the exhibition of its pictures in blocks but on the contrary licensed the exhibition of its pictures separately and individually.

96. During the period in question United Artists did not condition the licensing of any photoplay in any exhibitor's theatre upon that exhibitor's agreement to license other United photoplays for exhibition in said theatre.

97. Blind-selling is a practice whereby a distributor licenses a feature before the exhibitor is afforded an opportunity to view it.

98. Since the consent decree of November 20, 1940, the five major defendants have given each exhibitor, whether a defendant or independent, an opportunity at trade shows to view each feature before licensing it. In general, trade shows, which are designed to prevent blind-selling, are poorly attended by exhibitors.

99. During the 1943-44 season, the number of features distributed by eight distributor-defendants and the three other national distributors were as follows:

ent producers. The particular independent producers whose features have been distributed by RKO have varied from time to time. In the nine seasons ending 1943-44, 19.8% of the features distributed by RKO were independently produced, and 28.4% of RKO's gross receipts from domestic licenses of features was derived from such independently produced features.

102. It would be financially impossible for RKO to operate its theatres on features distributed by RKO alone.

| | | Percentages of Total | |
| | | With | With |
| | No. of | "Westerns" | "Westerns" |
| Distributor-defendants | Films | Included | Excluded |
|---|---|---|---|
| Fox | 33 | 8.31% | 9.85% |
| Loew's | 33 | 8.31% | 9.85% |
| Paramount | 31 | 7.81% | 9.25% |
| RKO | 38 | 9.57% | 11.34% |
| Warner | 19 | 4.79% | 5.67% |
| Columbia | 41 | 10.32% | 12.24% |
| United Artists | 16 | 4.04% | 4.78% |
| Universal | 49 | 12.34% | 14.63% |
| Sub-total | 260 | | |

Other National Distributors

| | | | |
|---|---|---|---|
| Republic { 29 features 30 "Westerns" | | 14.86% | 8.66% |
| Monogram { 26 features 16 "Westerns" | | 10.58% | 7.76% |
| PRC { 20 features 16 "Westerns" | | 9.07% | 5.97% |
| | | 100% | 100% |

Sub-
Total 137                 397
Total without "Westerns" 335

100. The percentage of features on the market which any of the five major defendants could play in its own theatres would be relatively small and in no-wise approximates a monopoly of film exhibition.

101. Continuously since its organization RKO has distributed features for independ-

103. Twentieth Century Fox produced less than 9 per cent. of the total number of features nationally distributed in the United States during each year between 1936-37 and 1944-45.

104. Universal has customarily produced at its studios at Universal City, California, during each theatrical year (commencing

on or about September 1st) between 45 and 50 feature-length motion picture photoplays, seven so-called Westerns, four Serials, 15 two-reel subjects, 30 single-reel subjects and 104 newsreels.

105. Said motion pictures were distributed by Universal and licensed for exhibition by motion picture theatres throughout the United States by means of a system of 31 exchanges located in various States in the United States, from the East Coast to the West Coast and from Canada to the Sothern boundary. Universal also maintained a Home Office in the City of New York.

106. In marketing its motion pictures, Universal's usual and customary practice was to offer to license to exhibitors, by title and description as aforesaid, its entire line of pictures, consisting of feature-length motion picture photoplays, Westerns, short-subjects (consisting of serials and two-reel and one-reel pictures) and newsreels. In this way approximately 50 feature-length motion picture photoplays, a group of Westerns, short-subjects, two so-called "Special" photoplays, three features produced by independent producers, and newsreels, were offered to exhibitors by Universal each year.

106A. During recent years, in excess of 600 feature-length motion-picture photoplays were released each year in the United States, exclusive of foreign-made films. Universal releases of feature-length photoplays, including Westerns and so-called Marquee pictures, during said period, equalled approximately 8% of the total number of feature-length photoplays released in the United States each year.

107. During the period in question, United Artists Corporation distributed between 20 to 26 pictures a year when the corporation had a good year and has handled as low as four in distribution in a releasing season.

108. At no time during the period in question did United Artists distribute more than 5% of the feature photoplays American made and distributed in the United States of America and generally distributed less than 5% of such releases.

109. That in each distribution agreement with each producer using the facilities of United Artists for distribution among other things there appears substantially the following language:

"United agrees to devote its best efforts to the proper marketing and disposition of the motion pictures delivered hereunder in all the territories licensed hereunder wherein it customarily markets motion pictures, and to make such marketing as complete and efficient as practicable, so that the gross returns from the marketing of the product hereunder shall be as large as possible and at the same time consistent with the sound business policy of United.

"United will use its best efforts to procure prices, license fees and rentals in a fair and open market reasonably satisfactory to the Producer.

"Exhibition Contracts: The exhibition contracts for each of such motion pictures delivered hereunder shall be made separate and apart from the exhibition contract of any other motion picture marketed by United, with the exception that in territories other than the United States where it is customary to include more than one motion picture on a contract, the Producer authorizes United to market its product in accordance with that custom. In no event, however, shall any motion picture of the Producer be used to enforce the licensing, leasing or other disposition of any other motion picture marketed by United, and in such territory where it is the custom to include on one contract more than one motion picture United shall set out the respective license fees for each motion picture after the name of such motion picture.

"United agrees upon the written direction of Producer that United shall market wherever permissible the motion pictures designated by the Producer or its agent as a unit, and in such case such unit shall be licensed separate and apart from any other motion picture marketed by United, with the exception that in those countries where it is the custom to market all of the motion pictures on one contract, United shall adhere to the prevailing custom.

"The Producer shall have the right to designate a representative for the terri-

tories hereinafter specified. The Producer shall bear all the expenses of such representative. Such representative must have an office in the central location of such territory, and if so United shall submit to such representative for his approval or rejection all proposed written contracts with exhibitors for that territory. The territories and their central location are as follows:

| Territory | Central Location |
|---|---|
| United States and Canada | New York |
| Brititsh Isles | London |
| Australia | Sydney |

"Producer agrees that such submission shall not be necessary if made impractical by conditions beyond the control of United, such as conditions arising out of war.

"If the Producer has designated such a representative for any such territory, United shall submit for his approval or rejection each proposed written contract for the distributing, exhibiting or marketing of such Producer's motion pictures or any of them in the territory in which such representative is acting. No such contract shall be accepted by United if within three (3) succeeding business days following the date on which said proposed written contract has been received by the Producer or its representative the Producer or its representative shall return such proposed contract to United with its rejection noted thereon or appended thereto.

"Should the Producer or its representative reject any such proposed contract the Producer or its representative shall have fourteen (14) days from the date of rejection in which to obtain a more favorable contract. Should the Producer or its representative fail so to do the original contract shall ipso facto be deemed approved unless the Producer or its representative shall have designated its original rejection as final. No proposed contract on which the rejection has been designated as final shall be entered into by United.

"Should the Producer or its representative at any time agree in advance with United upon the rental terms or license fees for the distribution, exhibition or marketing of any motion picture in any specified theatre or situation, United shall not be obligated to submit the contract containing the terms so agreed upon to the Producer or its representative for approval."

110. Various contract provisions by which discriminations against small independent exhibitors and in favor of the large affiliated and unaffiliated circuits were accomplished are: Suspending the terms of a given contract, if a circuit theatre remains closed for more than eight weeks, and reinstating it without liability upon reopening; allowing large privileges in the selection and elimination of films; allowing deductions in film rentals if double bills are played; granting moveovers and extended runs; granting roadshow privileges; allowing overage and underage; granting unlimited playing time; excluding foreign pictures and those of independent producers; granting rights to question the classification of features for rental purposes. These provisions are found most frequently in franchises and master agreements, which are made with the larger circuits of affiliated and unaffiliated theatres. Small independents are usually licensed, however, upon the standard forms of contract, which do not include them. The competitive advantages of these provisions are so great that their inclusion in contracts with the larger circuits constitutes an unreasonable discrimination against small competitors.

111. The discriminations referred to in Finding 110 would appear to be impossible under a system where the exhibitors competing for a license to exhibit a given feature on a given run do so on a parity since the same offer must be made to all prospective exhibitors in each competitive area.

112. Agreements were made by the exhibitor-defendants with each other and their affiliates by which given theatres of two or more exhibitors, normally in competition with each other, were operated as a unit, or most of their business polices collectively determined by a joint committee or by one of the exhibitors, and by which profits of the "pooled" theatres were divided among the exhibitors in or owners

of such theatres according to pre-agreed percentages or otherwise. Some of the agreements provide that the parties thereto may not acquire other theatres in the competitive vicinity without first offering them for inclusion in the "pool". The result is to eliminate competition pro tanto both in exhibition and in distribution of features which would flow almost automatically to the theatres in the earnings of which they have a joint interest.

113. Other forms of operating agreements are between major defendants and independent exhibitors rather than between major defendants. The effect is to ally two or more theatres of different ownership into a coalition for the nullification of competition between them and for their more effective competition against theatres rot members of the "pool".

114. In certain other cases the operating agreements are accomplished by leases of theatres, the rentals being determined by a stipulated percentage of profits earned by the "pooled" theatres. This is but another means of carrying out the restraints found above.

115. Many theatres, or the corporations owning them, are held jointly by one or more of the exhibitor-defendants, together with another exhibitor-defendant, in some cases in conjunction with independents. These joint interests enable the major defendants to operate theatres collectively, rather than competitively. When a defendant or an independent owns an interest of five percent or less, such an interest is de minimis and only to be treated as an inconsequential investment in exhibition.

116. When theatres are jointly owned by a major defendant and another party, it is evident that both joint owners wish to participate and indeed are directly or indirectly participating in the business of exhibiting motion pictures. The major defendant thereby eliminates putative competition between itself and the other joint owner, who otherwise would be in a position to operate theatres independently.

117. Such joint interests as those described above in findings 112 through 116 exist in a great number of theatres, a summary of which is set forth in the follow-

ing tabulation taken from RKO's Exhibit 11:

Theatres jointly owned with independents:

| | |
|---|---|
| Paramount | 993 |
| Warner | 20 |
| Fox | 66 |
| RKO | 187 |
| Loew's | 21 |

Theatres jointly owned by two defendants:

| | |
|---|---|
| Paramount-Fox | 6 |
| Paramount-Loew's | 14 |
| Paramount-Warner | 25 |
| Paramount-RKO | 150 |
| Loew's RKO | 3 |
| Loew's Warner | 5 |
| Fox-RKO | 1 |
| Warner-RKO | 10 |
| Total | 1,501 Theatres |

Of the above theatres jointly owned with independents, the following number will not be affected by the decree, since the defendant or co-owning independent owns less than a 5% interest:

| | |
|---|---|
| Paramount | 177 |
| RKO | 32 |
| Total | 209 Theatres |

Total affected by the decree according to RKO's Exhibit 11 ........................1,292 Theatres

118. In the year 1945 there were about 18,076 motion picture theatres in the United States, of which the five major defendants had interests in 3,137, or 17.35%. Of the latter, Paramount or its subsidiaries owned independently of the other defendants 1,395—a little less than half, or about 7.72%; Warner 501, or about 2.77%; Loew's 135, or about .74%; Fox 636, or about 3.52%; and RKO 109, or about .60%. There were 361 theatres, or about 2.00%, in which two or more of these defendants had joint interests, whether held directly or indirectly through stock ownership in the same corporation or through a lease or operating agreement. This tabulation excludes theatres connected with one or more of the defendants through film-buy-

68

ing or management contracts or through corporations in which a defendant owned an indirect minority stock interest. It includes all theatres in which each defendant otherwise owned a direct or indirect interest of any amount.

119. The present theatre holdings of the five defendant-exhibitors, Paramount, Loew's, Fox, RKO and Warner, aggregate little more than one-sixth of all the theatres in the United States, and by such theatre holdings alone the defendants do not and cannot collectively or individually have a monopoly of exhibition.

120. On January 1, 1935, Loew's operated in the United States 126 theatres. The first-run theatres, which are engaged to a large extent in exhibiting Loew's own product, Metro pictures, serve as "showcases" for those pictures in the areas where the theatres are located.

121. The formation of RKO resulted in the conversion of vaudeville theatres acquired by it into motion picture theatres and thereby introduced new and substantial competition into the exhibition field in the cities in which each of these theatres was located.

122. Ownership and operation by RKO of theatres in certain principal cities of the United States enables RKO through the utilization of the facilities of such theatres to plan and direct the first exploitation of the features which it distributes in such areas in a more effective manner than is possible in areas where RKO does not operate theatres.

123. The successful exhibition of a feature in its initial runs in any area is widely publicized and closely observed by subsequent run exhibitors in that area and success in exploiting a picture in such exhibitions produces increased revenue both for the distributor and for subsequent run exhibitors.

124. Each of the five major defendants is able to coordinate the initial exhibition of its features in its theatres with an extensive and accurately timed national advertising campaign.

125. Twentieth Century-Fox is interested in theatres in only 16 of the 92 cities having a population of over 100,000.

In 12 of these 16 cities features of one or more defendants is licensed to independent first run exhibitors competing with Twentieth Century-Fox (New York, Seattle, Denver, Portland, Oakland, San Diego, Long Beach, Los Angeles, San Francisco, Spokane, Sacramento, and Kansas City, Kansas) as well as to other defendants having theatres in some of these cities. In three of the remaining four cities, there is also first run competition from others of the defendants.

126. The 17.35% of theatres which comprise the five circuits of the major defendants pay from 35 to 54% of the total domestic film rental respectively received by the eight distributor defendants and 45% of the total domestic film rental received by all of said distributor-defendants. The five largest unaffiliated circuits together pay less than 5% of such rental.

127. The major defendants, as distributors, during the 1943–44 season, received from 71 to 81% of the film rental that was paid to all distributors by exhibitors affiliated with the five major defendants. The minor defendants received from 26 to 15% of such rental and the independent distributors from 2½ to 4½% of such rental.

128. During the 1943–44 season the eight distributor defendants received 45.-2% of the total feature film rental, received by them, from theatres affiliated with the five major defendants; and 54.-8% of such rental from other exhibitors.

129. In some situations where Paramount had theatre interests, other defendant distributors licensed their features to competing theatres and not to the Paramount theatres, and in some cases the operating companies in which Paramount was interested were not able to obtain the right to exhibit the features of some of the other defendant distributors.

130. Paramount features are licensed for exhibition in from 8,000 to 14,500 theatres in the United States annually. The number of licenses each year varies from feature to feature and from year to year.

131. In 21 of the 36 out of the 92 cities where Loew's operates theatres none of the other four producer-exhibitors licensed

its features in the 1943-44 season for first-run exhibition in a Loew's theatre, to the extent of more than three features, the Loew's theatres' first-run exhibition being otherwise limited to its own features and those of non-theatre-owning producers.

132. Over the 10 years from 1935 to 1945, the total number of features licensed by the other four theatre-owning distributors to Loew's first-run houses, decreased from 1382 to 998 and the features of non-theatre-owning distributors, increased from 1201 to 1879.

133. In 1935, the other four theatre-owning distributors earned $2,611,986 from Loew's theatres and the non-theatre-owning distributors earned $2,205,330 ($406,656 less). In 1944, the non-theatre-owning distributors earned $5,261,116 in Loew's theatres, which was $419,477 more than the $4,841,639 earned in Loew's theatres in that year by the four other theatre-owning distributors.

134. In 1944, the percentage of the total film rental paid by Loew's theatres to each of the non-theatre-owning distributors, Columbia (8.8%), United Artists (8.3%) and Universal (7.4%), was higher than that paid to each of three producer-exhibitors, RKO (2.1%), Warner Bros. (2.1%) and Twentieth Century-Fox (6.1%).

135. In the year 1944, of the total film rental paid by Loew's theatres, 47.9% was to Loew's itself for the exhibition of Loew's pictures, and 27.1% was to non-theatre-owning distributors. Thus a total of 75% of all film rentals paid by Loew's theatres went to persons other than the four other defendant-producer-exhibitors.

136. During the 1943-44 season RKO received 56.9% of its total license fees from independent theatres, 14.1% from its own theatres, and (in the aggregate) 29% from theatres affiliated with other defendants.

137. In the 1943-44 season, of the total number of exhibitions of features in first-run and metropolitan circuit run theatres operated by RKO, 23.1% were exhibitions of features distributed by RKO, 29.6% were exhibitions of features distributed by other theatre-owning distributors, and 47.-3% were exhibitions of features distributed by non-theatre-owning distributors.

138. In the four pre-war seasons of 1937-1940, Warner derived about 61-6/10% of its domestic gross rentals from theatres not affiliated with any of the defendants, about 14% from theatres in which it had an interest, about 13% from theatres in which Paramount had an interest, about 4% from theatres in which Twentieth Century-Fox had an interest, about 6% from theatres in which RKO had an interest, and less than 1% from theatres in which Loew had an interest.

139. Of its total domestic and foreign rentals Warner received about 30% from abroad, about 43% from theatres in which none of the defendants had an interest, about 10% from Warner's own American theatres, and the balance, about 16%, from American theatres in which one or more of the defendants had an interest.

140. Not a single one of the Loew first run theatres in the 39 of the 92 largest cities where Loew operates or has an interest in first run theatres licensed a Warner feature for exhibition in the 1943-44 season. In the same season the Warner theatres regularly exhibited the Loew features in many of the 28 of the 92 largest cities where Warner operated or had an interest in first run theatres.

141. The dollars paid by Warner to each of the other defendants and by each of the other defendants to Warner show no uniformity of pattern from company to company from year to year.

142. There were marked variances from year to year in the sums paid as rental by the theatres in which Warner had an interest to United Artists, Universal, and Columbia, the non-theatre owning defendants.

143. Between 1937 and 1944 the theatres in which Warner had an interest substantially decreased the amount of film rental paid to the-five theatre owning defendants, and substantially increased film rental paid to the non-theatre owning defendants.

144. Of the total film revenue received by Twentieth Century-Fox in 1944 from all theatres in the United States, 60.8% was paid by exhibitors not defendants in

this action; 14.1% was paid by its own theatres; 1.26% by Loew theatres; 5.52% by RKO theatres; 13.46% by theatres in which Paramount had an interest; and 4.82% by Warner theatres.

145. On January 1, 1935, there were 13,-386 theatres operating in the United States. In 1945, there were 18,076 theatres operating in the United States.

146. In about 60% of the 92 cities having populations of over 100,000, there are independent first-run theatres in competition with those of the major defendants except so far as it may be restricted by the trade practices found to have unreasonably restrained competition.

147. In about 91% of the 92 cities with over 100,000 population, there is competition on first runs between independent theatres and theatres of one or more of the defendants, or among the defendants themselves, except so far as it may be restricted by the trade practices found to have unreasonably restrained competition. In the remainder of the 92 cities there is always competition in some run.

148. In the aforementioned 92 cities, at least 70% of all of the first run theatres are affiliated with one or more of the major defendants. In four of said cities there are no affiliated theatres. In 38 of said cities there are no independent first run theatres. In the remaining 50 cities the degree of first run competition varies from the most predominantly affiliated first run situations, such as Boston, Chicago, Los Angeles, Philadelphia, St. Paul, and Washington, D. C., in each of which the independent first run theatres played less than eleven of the defendants' features on first run during the 1943-44 season, to the most predominantly independent first run situations, such as Nashville, Louisville, Indianapolis, and St. Louis, where the affiliated first run theatres played at least 31 of the defendants' pictures on first run during that season. In none of the said 50 cities did less than three of the distributor-defendants license their product on first run to the affiliated theatres. In 19 of said 50 cities less than three defendant-distributors licensed their product on first run to independent theatres. In a majority of said 50 cities the major share of all of the defendants' fea-

tures were licensed for first run exhibition in theatres affiliated with the major defendants.

149. Loew's operates first-run theatres in 36 of the 92 cities in the United States with more than 100,000 population; in every one of these 36 cities, there are other "first-run" theatres exhibiting the features of one or more of the other defendant distributors; in 21 of these 36, one or more of the other first-run theatres are operated by independents.

150. Of the 92 cities in the United States having a population in excess of 100,000, Twentieth Century-Fox is interested in first run theatres in 16 and licenses its features to them. In four of the remaining cities, none of the defendants has theatre interests. This leaves 72 cities in which there are first run theatres operated by defendants other than Twentieth Century-Fox. In 23 of the 72 cities, Twentieth Century-Fox licenses its features to independent exhibitors.

151. Except for a very limited number of theatres in the very largest cities, the 18,000 and more theatres in the United States exhibit the product of more than one distributor. Such theatres could not be operated on the product of only one distributor.

152. There is no substantial proof that any of the corporate defendants was organized or has been maintained for the purpose of achieving a national monopoly either in production, distribution, or exhibition of motion pictures, except as found in findings 153 and 154 below.

153. In localities where there is ownership by a single defendant of all the first-run theatres, there is no sufficient proof that it has been for the purpose of creating a monopoly and has not rather arisen from the inertness of the competitors, their lack of financial ability to build theatres comparable to those of the defendants, or from the preference of the public for the best equipped houses and not from "inherent vice" on the part of these defendants.

154. The illegalities and restraints herein found, are not in the ownership of many or most of the best theatres by the producer-distributors, but in admission price-

fixing, non-competitive granting of runs and clearances, unreasonable clearances, formula deals, master agreements, franchises, block-booking, pooling agreements and certain discriminations among licensees between defendants and independents. These practices, if employed in the future, in favor of powerful independents would effect all of the undesirable results that have existed when the five exhibitor defendants and their subsidiaries have owned or controlled numerous theatres in which the defendants' pictures have been exhibited.

155. Total divestiture would be injurious to the corporations concerned and would be damaging to the public.

156. Total divestiture would not remedy the price-fixing, systems of clearance, formula deals, master agreements and franchises, block-booking, pooling agreements and the other practices which have been found unreasonably to restrict competition.

157. During the nine pre-war years of 1933-1941, the average cost of American made Warner features rose from $241,000 in 1933 to $448,000 in 1940. By 1945 the average cost had risen to $1,371,000.

158. In the past the foreign business of Warner has been exceedingly profitable.

159. With the cessation of the war the foreign markets for Warner pictures are being severely restricted.

160. The arbitration system created by the Consent Decree of November 20, 1940, has demonstrated its usefulness in dealing with exhibitors' complaints of unreasonable clearance and if extended to cover differences which may occur under the system to be established by the Decree herein, will be effective and result in quick and expeditious decisions and a saving of time and money.

### Conclusions of Law.

1. The court has jurisdiction of this cause under the provisions of the Act of July 2, 1890 entitled "An act to protect trade and commerce against unlawful restraints and monopolies," hereinafter referred to as the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note.

2. Universal Pictures Company, Inc., and Screen Gems, Inc., have not violated the Sherman Act and should be dismissed as defendants herein.

3. None of the defendants herein has violated the Sherman Act by monopolizing or attempting to monopolize or conspiring to monopolize the production of motion picture films.

4. The consent decree entered herein on November 20, 1940, does not foreclose enforcement in this suit at this time of any rights or remedies, which the plaintiff may have against any of the defendants by virtue of violations of the Sherman Act by them, except such acts as were in accord with such decree during the period it was in force.

5. None of the defendants herein has violated the Sherman Act by combining, conspiring or contracting to restrain trade in any part of the business of producing motion pictures or by monopolizing, attempting to monopolize, or conspiring to monopolize such business.

6. The defendants, and each of them are entitled to judgment dismissing all claims of the plaintiff based upon their acts as producers, whether as individuals or in conjunction with others.

7. The defendants Paramount Pictures, Inc.; Paramount Film Distributing Corporation; Loew's Incorporated; Radio-Keith-Orpheum Corporation, RKO Radio Pictures, Inc.; Keith-Albee-Orpheum Corporation; RKO Proctor Corporation; RKO Midwest Corporation; Warner Bros. Pictures, Inc.; Vitagraph, Inc.; Warner Bros. Circuit Management Corporation; Twentieth Century-Fox Film Corporation; National Theatres Corporation; Columbia Pictures Corporation; Columbia Pictures of Louisiana, Inc.; Universal Corporation; Universal Film Exchanges, Inc.; Big U Film Exchange, Inc.; and United Artists Corporation have unreasonably restrained trade and commerce in the distribution and exhibition of motion pictures and attempted to monopolize such trade and commerce, both before and after the entry of said consent decree, in violation of the Sherman Act by:

(a) Acquiescing in the establishment of a price fixing system by conspiring with

one another to maintain theatre admission prices;

(b) Conspiring with each other to maintain a nation-wide system of runs and clearances which is substantially uniform in each local competitive area.

■ 8. The distributor defendants Paramount Pictures, Inc.; Paramount Film Distributing Corporation; Loew's, Incorporated; Radio-Keith-Orpheum Corporation; RKO Radio Pictures, Inc.; Warner Bros. Pictures, Inc.; Vitagraph, Inc.; Twentieth Century-Fox Film Corporation; Columbia Pictures Corporation; Columbia Pictures of Louisiana, Inc.; Universal Corporation; Universal Film Exchanges, Inc.; Big U Film Exchange, Inc.; and United Artists Corporation, have unreasonably restrained trade and commerce in the distribution and exhibition of motion pictures and attempted to monopolize such trade and commerce, both before and after the entry of said consent decree, in violation of the Sherman Act by:

(a) Conspiring with each other to maintain a nation-wide system of fixed minimum motion picture theatre admission prices;

(b) Agreeing individually with their respective licensees to fix minimum motion picture theatre admission prices;

(c) Conspiring with each other to maintain a nation-wide system of runs and clearances which is substantially uniform as to each local competitive area;

(d) Agreeing individually with their respective licensees to grant discriminatory license privileges to theatres affiliated with other defendants and with large circuits as found in finding No. 110 above;

(e) Agreeing individually with such licensees to grant unreasonable clearance against theatres operated by their competitors;

(f) Making master agreements and franchises with such licensees;

(g) Individually conditioning the offer of a license for one or more copyrighted films upon the acceptance by the licensee of one or more other copyrighted films, except in the case of the United Artists Corporation;

(h) The defendants Paramount and RKO making formula deals.

■ 9. The exhibitor-defendants, Paramount Pictures, Inc.; Loew's Incorporated; Radio-Keith-Orpheum Corporation; Keith-Albee-Orpheum Corporation; RKO Proctor Corporation; RKO Midwest Corporation; Warner Bros. Pictures, Inc.; Warner Bros. Circuit Management Corporation; Twentieth Century-Fox Film Corporation; and National Theatres Corporation have unreasonably restrained trade and commerce in the distribution and exhibition of motion pictures both before and after the entry of said consent decree, in violation of the Sherman Act by:

(a) Jointly operating motion picture theatres with each other and with independents through operating agreements or profit-sharing leases;

(b) Jointly owning motion picture theatres with each other and with independents through stock interests in theatre buildings;

(c) Conspiring with each other and with the distributor-defendants to fix substantially uniform minimum motion pictures theatre admission prices, runs, and clearances;

(d) Conspiring with the distributor-defendants to discriminate against independent competitors in fixing minimum admission price, run, clearance and other license terms.

■ 10. The Formula deals, master agreements and franchises referred to in Findings 86, 88 and 89 have tended to restrain trade and violate Section 1 of the Sherman Act.

■ 11. Block-booking as hereinabove defined, violates the Sherman Act.

12. Further conclusions of law are made and embodied in the decree filed herewith.

## DECREE.

### PER CURIAM.

The court having rendered its opinion herein on June 11, 1946, 66 F.Supp. 323, having duly considered the proposals of the parties and of amici curiæ as to its findings and judgment, and having filed its findings of fact and conclusions of law,

73

wherein certain of the defendants herein were found to have violated the Act of Congress approved July 2, 1890, 26 Stat. 209, commonly known as the Sherman Act.

It is hereby ordered, adjudged and decreed, as follows:

I. 1. The complaint is dismissed as to the defendants Screen Gems, Inc., and the corporation named as Universal Pictures Company, Inc., merged during the pendency of this case into the defendant Universal Corporation. The complaint is also dismissed as to all claims made against the remaining defendants herein based upon their acts as producers, whether as individuals or in conjunction with others.

II. Each of the defendant distributors, Paramount Pictures, Inc.; Paramount Film Distributing Corporation; Loew's Incorporated; Radio-Keith-Orpheum Corporation; RKO Radio Pictures, Inc.; Warner Bros. Pictures, Inc.; Warner Bros. Pictures Distributing Corporation [formerly known as Vitagraph, Inc.]; Twentieth-Century Fox Film Corporation; Columbia Pictures Corporation; Columbia Pictures of Louisiana, Inc.; Universal Corporation; Universal Film Exchanges, Inc.; Big U Film Exchange, Inc.; and United Artists Corporation; and the successors of each of them, and any and all individuals who act in behalf of any thereof with respect to the matters enjoined, and each corporation in which said defendants or any of them own a direct or indirect stock interest of more than 50%, is hereby enjoined:

1. From granting any license in which minimum prices for admission to a theatre are fixed by the parties, either in writing or through a committee, or through arbitration, or upon the happening of any event or in any manner or by any means.

2. From agreeing with each other or with any exhibitors or distributors to maintain a system of clearances; the term "clearances" as used herein meaning the period of time stipulated in license contracts which must elapse between runs of the same feature within a particular area or in specified theatres.

3. From granting any clearance between theatres not in substantial competition.

4. From granting or enforcing any clearance against theatres in substantial competition with the theatre receiving the license for exhibition in excess of what is reasonably necessary to protect the licensee in the run granted. Whenever any clearance provision is attacked as not legal under the provisions of this decree, the burden shall be upon the distributor to sustain the legality thereof.

5. From further performing any existing franchise to which it is a party and from making any franchises in the future. The term "franchise" as used herein means a licensing agreement or series of licensing agreements, entered into as a part of the same transaction, in effect for more than one motion picture season and covering the exhibition of pictures released by one distributor during the entire period of agreement.

6. From making or further performing any formula deal or master agreement to which it is a party. The term "formula deal" as used herein means a licensing agreement with a circuit of theatres in which the license fee of a given feature is measured for the theatres covered by the agreement by a specified percentage of the feature's national gross. The term "master agreement" means a licensing agreement, also known as a "blanket deal" coving the exhibition of features in a number of theatres usually comprising a circuit.

7. From performing or entering into any license in which the right to exhibit one feature is conditioned upon the licensee's taking one or more other features. To the extent that any of the features have not been trade shown prior to the granting of the license for more than a single feature, the licensee shall be given by the licensor the right to reject 20% of such features not trade shown prior to the granting of the license, such right of rejection to be exercised in the order of release within ten days after there has been an opportunity afforded to the licensee to inspect the feature.

8. From licensing in the future any feature for exhibition in any theatre, not its own, in any manner except the following:

(a) A license to exhibit each feature released for public exhibition in any competitive area shall be offered to the operator of each theatre in such area who desires to exhibit it on some run [other than that upon which such feature is to be exhibited in the theatre of the licensor] selected by such operator, and upon uniform terms;

(b) Each license shall be granted solely upon the merits and without discrimination in favor of affiliates, old customers or others;

(c) Where a run is desired, or is to be offered, upon terms which exclude simultaneous exhibition in competing theatres, the distributor shall notify, not less than thirty days in advance of the date when bids will be received, all exhibitors in the competitive area, offering to license the features upon one or more runs, and in such offer shall state the amount of a flat rental as the minimum for such license for a specified number of days of exhibition, the time when the exhibition is to commence and the availability and clearance, if any, which will be granted for each such run. Within fifteen days after receiving such notice, any exhibitor in such competitive area may bid for such license, and in his bid shall state what run such exhibitor desires and what he is willing to pay for such feature, which statement may specify a flat rental, or a percentage of gross receipts, or both, or any other form of rental, and shall also specify what clearance such exhibitor is willing to accept, the time and days when such exhibitor desires to exhibit it, and any other offers which such exhibitor may care to make. The distributor may reject all offers made for any such feature, but in the event of the acceptance of any, the distributor shall grant such license upon the run bid for to the highest responsible bidder, having a theatre of a size, location and equipment adequate to yield a reasonable return to the licensor. The method of licensing specified in this subdivision shall not be required in areas where there is no competition among theatres or in run, or in which there is no offer made by any exhibitor within the time above mentioned. The words "exclude simultaneous exhibition" shall be held to mean the exhibition of a specified run in one theatre with clearance over other theatres in the competitive area. The words "competitve area" shall refer to the territory occupied by more than one theatre in which it may fairly and reasonably be said that such theatres compete with each other for the exhibition of features on any run.

(d) Each license shall be offered and taken theatre by theatre and picture by picture.

(e) A theatre is not a defendant's own theatre unless it owns therein a legal or equitable interest of 95% or more, either directly or through affiliates or subsidiaries.

9. From arbitrarily refusing the demand of an exhibitor, who operates a theatre in competition with another theatre not owned or operated by a defendant distributor, or its affiliate or subsidiary, made by registered mail, addressed to the home office of the distributor, to license a feature to him for exhibition on a run selected by the exhibitor, instead of licensing it to another exhibitor for exhibition in his competing theatre on such run. Such demand shall be deemed to have been refused either upon the receipt by the exhibitor of a refusal in writing or upon the expiration of ten days after the receipt of the exhibitor's demand.

III. Each of the defendant exhibitors, Paramount Pictures, Inc., Loew's Incorporated, Radio-Keith-Orpheum Corporation, Keith-Albee-Orpheum Corporation, RKO Proctor Corporation, RKO Midwest Corporation, Warner Bros. Pictures, Warner Bros. Circuit Management Corporation, Twentieth Century Fox Film Corporation, and National Theatres, Inc., is hereby enjoined and restrained:

(1) From performing or enforcing agreements referred to in paragraphs 5 and 6 of the foregoing section II hereof to which it may be a party.

(2) From making or continuing to perform pooling agreements whereby given theatres of two or more exhibitors normally in competition are operated as a unit or whereby the business policies of such exhibitors are collectively determined by a joint committee or by one of the exhibitors or whereby profits of the "pooled"

theatres are divided among the owners according to prearranged percentages. The pooling agreement by one or more defendants, with others not parties to this action which violate this provision shall be dissolved prior to July 1, 1947.

(3) From making or continuing to perform agreements that the parties may not acquire other theatres in a competitive area where a pool operates without first offering them for inclusion in the pool.

(4) From making or continuing leases of theatres under which it leases any of its theatres to another defendant or to an independent operating a theatre in the same competitve area in return for a share of the profits. The leases referred to herein between a defendant and independents which violate this provision shall be terminated prior to July 1, 1947.

(5) From continuing to own or acquiring any beneficial interest in any theatre, whether in fee or shares of stock or otherwise, in conjunction with another defendant, and from continuing to own or acquire such an interest in conjunction with an independent [meaning any former, present or putative motion picture theatre operator which is not owned or controlled by the defendant holding the interest in question], where such interest shall be greater than 5% unless such interest shall be 95% or more. The existing relationships which violate this provision shall be terminated within two years. The relationships between the defendants and independents which violate this provision shall be terminated by a sale to, or purchase from the co-owner or co-owners, or by a sale to a party not one of the other defendants. In dissolving relationships among defendants and between defendants and independents which violate this provision, one defendant may acquire the interest of another defendant or independent if such defendant desiring to acquire such interest shall show to the satisfaction of the court, and the court shall first find, that such acquisition will not unduly restrain competition in the exhibition of feature motion pictures. Each of the defendants shall submit to this court within six months a statement outlining the extent to which it has complied and the manner in which it proposes to comply with this provision, setting forth in detail the names, locations, and general descriptions of the theatres, corporate securities, and beneficial interests of any kind involved, the sales thereof that it has made, and such interests as it proposes to acquire, with a statement of facts regarding each competitive situation involved in such proposed acquisition sufficient to show the probable effect of such acquisition on that situation. Similar reports shall be made quarterly thereafter until this provision shall have been fully complied with. Reasonable notice of such acquisition plans shall be served upon the Attorney General and plaintiff shall be given an opportunity to be heard with respect thereto before any such acquisition shall be approved by the court.

(6) From expanding its present theatre holdings in any manner whatsoever except as permitted in the preceding paragraph.

(7) From operating, booking, or buying features for any of its theatres through any agent who is known by it to be also acting in such manner for any other exhibitor, independent or affiliate.

IV. Nothing contained in this Decree shall be construed to limit, in any way whatsoever, the right of each distributor-defendant to license, or in any way to arrange or provide for, the exhibition of any or all the motion pictures which it may at any time distribute, in such manner, and upon such terms, and subject to such conditions as may be satisfactory to it, in any theatre in which such distributor defendant has or may acquire pursuant to the terms of this Decree, a proprietary interest of 95% or more either directly or through subsidiaries.

V. The provisions of the existing consent decree are hereby declared to be of no further force or effect, except in so far as may be necessary to conclude arbitration proceedings now pending and to liquidate in an orderly manner the financial obligations of the defendants and the American Arbitration Association, incurred in the establishment of the consent decree arbitration systems. Existing awards and those made pursuant to pending proceedings shall continue to be enforceable. But this shall

in no way preclude the parties or any other persons from setting up a reasonable system of arbitration either through the use of the present boards or any others as among themselves.

VI. For the purpose of securing compliance with this Decree, and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General or the Assistant Attorney General in charge of antitrust matters, and on notice to any defendant, reasonable as to time and subject matter, made to such defendant at its principal office, and subject to any legally recognized privilege, (1) be permitted reasonable access, during the office hours of such defendant, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of such defendant, relating to any of the matters contained in this Decree, and that during the times that the plaintiff shall desire such access, counsel for such defendant may be present, and (2) subject to the reasonable convenience of such defendant, and without restraint or interference from it, be permitted to interview its officers or employees regarding any such matters, at which interview counsel for the officer or employee interviewed and counsel for such defendant company may be present.

Information obtained pursuant to the provisions of this section shall not be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department of Justice, except in the course of legal proceedings to which the United States is a party, or as otherwise required by law.

VII. Paragraphs 7 and 8 of section II of this judgment shall not become effective until July 1, 1947.

VIII. Jurisdiction of this cause is retained for the purpose of enabling any of the parties to the judgment and no others, to apply to the court at any time for such orders or direction as may be necessary or appropriate for the construction, modification, or carrying out of the same, for the enforcement of compliance therewith, and for the punishment of violations thereof, or for other or further relief.

IX. The operation of this judgment is stayed for sixty days from the date hereof, and, if an appeal is taken, for thirty days thereafter in order to enable any appellant to move before the Supreme Court for a stay in respect to any portion of the judgment from which an appeal has been taken.

## In Re Findings and Decree

In order to meet some of the objections raised at the hearing to the system of bidding for features described in the opinion of the court, we have modified the system there proposed so that competitive bidding will only be necessary within a competitive area and in such an area where it is desired by the exhibitors. In other words, the decree provides an opportunity to bid for any exhibitor in a competitive area who may desire to do so.

The arrangement for arbitration and an appeal board has been terminated except as to unfinished litigations and other matters referred to in the decree, because of the unwillingness of some of the parties to consent to their continuance. Nevertheless, as we have indicated in the opinion, these tribunals have dealt with trade disputes, particularly those as to clearances and runs, with rare efficiency, as both government counsel and counsel for other parties have conceded.

Indeed, the arbitration system set up under the consent decree of November 20, 1940, was created pursuant to the prayer of the amended and supplemental complaint by the United States filed November 14, 1940, in which, among other things, the plaintiff prayed that "a nation-wide system of impartial arbitration tribunals or such other means of enforcement as the court may deem proper be established pursuant to the final decree of this court in order to secure adequate enforcement of whatever general and nation-wide prohibitions of illegal practices may be contained therein."

We strongly recommend that some such system be continued in order to avoid cumbersome and dilatory court litigation and to preserve the practical advantages of the tribunals created by the consent decree.