### PARAMOUNT PICTURES THEATRES CORP. v. PARTMAR CORP. et al.

### PARAMOUNT PICTURES THEATRES CORP. v. PARTMAR CORP. et al. (PARAMOUNT PICTURES, Inc., et al., third-party defendants).

#### No. 6906.

United States District Court
S. D. California, C. D.
May 2, 1951.

O'Melveny & Myers, Los Angeles, Cal., for plaintiff.

Macfarlane, Schaefer & Haun, Los Angeles, Cal. (Russell Hardy, Washington, D. C., of counsel), for defendant.

WESTOVER, District Judge.

Paramount Productions, Inc. is engaged in the production of motion pictures. A subsidiary, Paramount Distributing Company, is engaged in distributing the motion pictures produced by Paramount Productions, Inc. Paramount Pictures Theatres Corporation, another subsidiary, plaintiff herein, is engaged in the operation of motion picture theatres. For the purpose of clarity, any and all of the above named corporations will hereinafter be referred to as Paramount.

The defendant Partmar Corporation was formed by the owners of Fanchon & Marco, Inc. for the purpose of leasing the Para-

mount Downtown Theatre in Los Angeles, California, from Paramount. The sole assets and business of Partmar Corporation are the holding of said lease and the operation of Paramount Downtown Theatre. All stock of Partmar Corporation is owned by Fanchon & Marco, Inc. For the purpose of this opinion defendants herein will be referred to as Partmar.

In July, 1938, the United States of America commenced an equity action in the United States District Court of New York entitled: "United States v. Paramount Productions, Inc., et al.", being Equity Number 87–273, which action was brought against eight major companies of the motion picture industry. The Government charged a conspiracy to carry out in the motion picture industry certain trade practices which were claimed to violate the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note.

In November, 1940, a consent decree was entered in the case in which Paramount, Loew's, Inc., Twentieth-Century Fox, Warners and R. K. O. consented. Columbia, United Artists and Universal did not consent. The consent decree, hereinafter referred to as the first consent decree, was to operate for a trial period of three years from the date of entry, to wit: November 20, 1940, during which three-year period the Government could not bring any proceedings to obtain any other or further relief. The Government, being dissatisfied with the first consent decree, after the lapse of the three-year period moved, in 1944, to modify the decree in certain respects. Hearings were had on the Government's application for modification, and on January 11, 1946, a written opinion was filed in which all franchise agreements of longer than a one-year period were held invalid. The opinion is reported in D.C., 66 F.Supp. 323.

Thereafter, findings of fact, conclusions of law, and a decree were entered on December 31, 1946, reported in D.C., 70 F. Supp. 53, which decree is hereinafter referred to as the 1946 decree. Appeals were taken from the 1946 decree, and in June, 1948, the Supreme Court rendered a decision therein, affirming the lower court in part and reversing it in part. The decision is found in 334 U.S. 131, 68 S.Ct. 915, 92 L. Ed. 1260. The case was sent back to the District Court of New York for further proceedings on certain issues.

Following rendition of the decision of the Supreme Court, and before any testimony was adduced at the hearings after remand from the Supreme Court to the District Court of New York, a second consent decree was rendered. Paramount Pictures, Inc. was a party to the second consent decree which was entered in the District Court on March 3, 1949. Six defendants did not consent to the second consent decree, and hearings proceeded against the six non-consenting defendants.

Upon completion of the hearings the New York Court entered a decree in favor of the Government and against the six defendants, in terms substantially the same as those of the second consent decree. D.C., 85 F.Supp. 881. An appeal was taken from the judgment. The Supreme Court refused to set aside the judgment and findings of the lower court, and as a consequence the second consent decree and the judgment against the six defendants not consenting thereto have become final.

On August 31, 1931, Paramount Pictures, Inc., predecessor of plaintiff herein, as lessor, entered into a lease agreement with Partmar Corporation, as lessee, by which Partmar was to take over and operate the Paramount Downtown Theatre for a period of years, upon terms as expressly set forth in said lease. At the same time the lease was entered into, a so-called film franchise agreement was executed by and between said parties, running for the same period of time as the lease. Said franchise agreement generally licensed Partmar to exhibit Paramount pictures at the Paramount Downtown Theatre and required Partmar to exhibit feature pictures released by Paramount.

■ Though two documents were executed—one a lease and the other a franchise agreement—it is evident the lease would not have been entered into if the franchise agreement had not also been entered into at the same time; and, conversely, the franchise agreement would not have been

entered into unless the lease had been entered into at the same time. Although there were two separate documents—one the lease and the other the franchise agreement—they were executed at the same time, between the same parties, for the same period of time and, as a consequence, must be considered as one agreement.

The lease expressly provided that if the franchise agreement was "for any reason cancelled or terminated," then Paramount might, at its option, cancel and terminate the lease. At the trial herein it was agreed by respective counsel that "any reason" did not mean capricious or arbitrary but that "any reason" meant substantial, and that the franchise agreement could not be terminated except for a legal or substantial reason.

Plaintiff in its brief states:

"Plaintiff has not contended, as asserted by Mr. Hardy, that termination of the franchise by the capricious or arbitrary act of Paramount would be effective to terminate the lease. * * * Plaintiff is not relying upon any arbitrary or capricious termination. It is relying upon a termination by legal means.

"Plaintiff's position * * * is that the phrase 'for any reason whatsoever' means 'any legal cause' or 'reason, something which the Court would accept as a good reason for terminating.' * * *"

Paramount contends that the Court in United States v. Paramount Pictures, D.C., 70 F.Supp. 53, 73, restrained the defendant Paramount "from further performing any existing franchise to which it is a party." However, Paramount knew this was not a final decree; that it was subject to review. But before the expiration of the time to appeal Paramount served notice of termination of the franchise agreement herein.

Paramount contends that it did not appeal from that portion of the decree restraining it from further performing any existing franchise. However, the case of United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, which was the appeal of the 70 F.Supp. 53 case, discloses that Whitney North Seymour argued the case (before the Supreme Court) for Paramount Pictures, Inc., et al. (Appellants No. 81); with him on the brief were Louis Phillips and Albert C. Bickford. Not only did Paramount know at the time notice of termination was given that the decision in 70 F.Supp. 53 was not a final decision, but it actively participated in an appeal to the Supreme Court from at least a part of that decree.

The Supreme Court, after hearing appeals in the case, including Paramount's, said, 334 U.S. at page 156, 68 S.Ct. at page 928: "* * * But we cannot say on this record that franchises are illegal per se * * *. Hence we set aside the findings on franchises * * *."

The first question presented to this Court is whether a decree, which is subsequently set aside, is a legal cause or reason for termination of the franchise agreement.

The Court of Appeals, 9 Cir., in the case of Keller v. Hall, 111 F.2d 129, at page 131, stated the rule when it held: "* * * Moreover, the judgment theretofore rendered in the case, after it was reversed, was 'without any validity, force, or effect'".

The same rule is set forth in a little different manner by the Supreme Court in the case of Arkadelphia Milling Co. v. St. Louis S. W. Ry. Co., 249 U.S. 134, at page 145, 39 S.Ct. 237, at page 242, 63 L.Ed. 517, when it said: "* * * a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby. This right, so well founded in equity, has been recognized in the practice of the courts of common law from an early period. Where plaintiff had judgment and execution, and defendant afterwards sued out a writ of error, it was regularly a part of a judgment of reversal that the plaintiff in error 'be restored to all things which he hath lost by occasion of the said judgment'; * * *."

The Supreme Court also said, in the case of Baltimore & O. R. Co. v. United States, 279 U.S. 781, at page 786, 49 S.Ct. 492, at page 493, 73 L.Ed. 954: "The right to recover what one has lost by the enforcement

of a judgment subsequently reversed is well established."

The Circuit Court of Appeals of the Second Circuit, in Bondy v. Harvey, 62 F.2d 521, 522, stated the rule in another way by saying: " * * * The effect of the reversal * * * was to put the parties in the same position as if no judgment had been entered."

Consequently, we are of the opinion that the restraining order, subsequently set aside by the United States Supreme Court, was not a legal cause or reason for terminating the franchise agreement.

Plaintiff contends, however, that if it was not justified in terminating the franchise agreement because of the decree, nevertheless it did have a right to terminate the franchise agreement as it was an illegal agreement and was illegal from its inception and thus could be terminated at any time. Hence, we now proceed to the question of the legality of the franchise agreement.

As heretofore mentioned, Paramount gave the following notice to Partmar:

"March 26, 1947

"Partmar Corporation,
"Paramount Theatre,
"Los Angeles, California.

"Gentlemen:

"You are hereby given notice that the undersigned, one of the parties to the film franchise agreement, made and entered into on August 30, 1939, as of September 1, 1939, between the undersigned and you, as amended by agreement dated September 1, 1942, made between the same parties, has been enjoined from further performing said franchise as amended by Decree of the United States District Court for the Southern District of New York, entered December 31, 1946, and modified by order entered February 1, 1947, in the case of United States of America, Plaintiff, against Paramount Pictures, Inc., Paramount Film Distributing Corporation, et al., bearing Index Number—Equity 87–273.

"You are therefore hereby notified that the said franchise agreement as amended be and the same hereby is cancelled and terminated, effective as of the close of business on the 31st day of March, 1947.

"Very truly yours,
"Paramount Pictures, Inc.

"By Paul Raebourn
"Vice President

"LP:V
"Reg. Mail-Spec. Del."

Although it is the contention of plaintiff that it had a right to terminate the franchise agreement because of its illegality, it will be noted that the only reason given for termination of the franchise agreement was the restraining order made by the United States Court.

On March 30, 1947, Paramount gave notice to the defendants that the lease had been terminated under that clause of the lease which provided that if the franchise agreement was "for any reason" cancelled or terminated, Paramount had the right to terminate the lease. On April 7, 1947, notice to quit was served on Partmar, and when Partmar failed and refused to vacate the theatre building, this action was commenced.

For many years in Los Angeles it was the established practice for each of the major motion picture producers to own and operate its own first-run theatre in downtown Los Angeles for the purpose of the initial run of pictures produced by the respective companies. Paramount Theatre was Paramount's first-run theatre in Los Angeles. The theatre was first built and operated by the producing company for the sole purpose of having an outlet in Los Angeles for its pictures' first runs. When the lease was made and executed between Paramount and Partmar, it was the desire of Paramount and the distinct understanding of all parties that Paramount Theatre would be the theatre in which Paramount pictures would have their first runs in Los Angeles.

The motion picture industry, like Topsy, "just growed", and the lusty, sprawling business of today is vastly different from the industry at its inception. In the begining there were no rules or regulations as guide posts. As problems were presented

they were solved by the industry, and over the years a code of conduct was developed which was accepted and eventually adopted by all of the major studios.

Like other industries, the motion picture industry discovered there were two phases of its business, the main phase being that of producing or actually making pictures; while the other, and perhaps of greater financial importance, was that of selling or distributing the studios' products. All great businesses have learned that production itself is only the beginning and, if a business is to succeed, some adequate scheme of distribution must be developed. All industries have not followed the same pattern of distribution. As a result, various types of businesses have adopted a diversity of ways and means to dispose of their products.

Obviously, it would be impossible for one motion picture producer to print sufficient film to permit distribution simultaneously to all theatres in the nation. Some plan had to be devised by which a few prints could be made and then prorated to exhibitors for use. As all exhibitors could not use the same film at the same time, some arrangement had to be made for first use, second use, third use, et cetera. It is probable that in the early days of the industry producers had difficulty in obtaining exhibitors to show their films, but as time went on and the number of exhibitors increased it became competitive among exhibitors as to which should obtain the first, second or third run rights of films.

No attempt was made by producers to divide the country into zones for distribution. No attempt was made by producers to divide the nation's large cities into zones and allocate to each zone a producer. The producers generally have operated in all parts of the country and in all cities. Although producers made no effort to divide cities into areas, nevertheless each major studio through its distributing agency was as a matter of necessity forced to allocate first, second or third run rights of its pictures to individual exhibitors. Over the years producers and distributors have founded a course of conduct based on the right to exhibit films first, second or third, within a given community. Certain speci-

fied theatres had the right of third run; others had the right of second run, while still others had the right of first run. Producers and distributors also built up a policy of clearance between the end of the first run and the beginning of the second run; the end of the second run and the beginning of the third run.

■ It is the accepted law of the land that individuals within an industry may not combine for the purpose of controlling competition. Toward the end of the late depression, however, the government attempted to do for various industries that which theoretically they could not do for themselves, and as a result Congress passed the National Recovery Act, commonly known as "N.R.A." Under such legislation industries were allowed to set up codes of fair competition. The motion picture industry in Los Angeles availed itself of the N.R.A. plan and established a code of fair competition which embraced the question of first, second and third runs, clearances between runs; minimum prices, et cetera. Although the Supreme Court of the United States, in Schechter Poultry Corporation et al. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, held such a code invalid, evidence in the case at bar indicates that the code as established for the motion picture industry in Los Angeles under N.R.A. is the basis of the code of fair conduct now in use in the motion picture industry in Southern California.

Paramount, not in conjunction with any other major studio, entered into the franchise agreement which gave to Partmar the right to exhibit the first-run feature pictures of Paramount in the City of Los Angeles.

■ One of our fundamental legal rights is that of making contracts. Contracts freely made should be upheld. It is not the duty of courts to look for some reason to set aside contracts freely entered into by and between individuals of their own volition; for individuals should have the right to make contracts as they see fit. The courts should seek reasons to sustain existing contracts legally entered into. Hence, as we see it, the duty of this court is to uphold the contract entered into between

Paramount and Partmar, unless it was entered into because of misrepresentation, fraud, undue influence, et cetera, or unless the contract is illegal and void because it violates statutory provisions.

· There is no evidence in this case that the contract was executed between the parties through misrepresentation, fraud or undue influence; and if the contract is to be set aside, it must be set aside on the ground that it is an illegal contract.

Plaintiff contends the franchise agreement is illegal and void (in violation of the anti-trust acts) for four reasons:

1. Because of its minimum price provisions.

2. Because of book blockings.

3. Because of runs.

4. Because of clearances.

The question of runs and clearances presents a most difficult problem. It is admitted by all the expert witnesses (both plaintiff's and defendant's) who testified in this case that runs and clearances are necessary in the motion picture industry. As heretofore mentioned, it is impossible to allow all theatres to show the same picture at the same time; hence some preference must be given to certain theatres. Runs and clearances have been used for many years, and even those permitted only second or third run rights are nevertheless of the opinion that runs are necessary and that there should be clearances between runs. In other words, after a theatre finishes a picture there should be a lapse of some days before the same film should be shown in another theatre in the same neighborhood.

However, the question here is not whether runs and clearances are necessary but whether the runs and clearances are reasonable. Testimony in this case indicates that within the Los Angeles metropolitan area there had been established the policy of first, second, third and subsequent runs, and there had been established clearances of 7, 14, 21, et cetera, days. Testimony also establishes the fact that theatres admittedly not in direct competition with downtown Los Angeles theatres were given the same runs and the same clearances as those in the downtown area of Los Angeles. For instance, theatres in San Diego (122 miles from Los Angeles), Santa Ana (35 miles from Los Angeles), Riverside (53 miles from Los Angeles), San Bernardino (60 miles from Los Angeles), Bakersfield (111 miles from Los Angeles), and Santa Barbara (96 miles from Los Angeles) were allowed to exhibit films the same day and date as released in Los Angeles. Motion picture theatres located in such communities were considered to be so far distant as to be not in substantial competition. Consequently, there was no necessity for establishing a different run or allowing a clearance over Los Angeles. Runs and clearances were allowed only as to those theatres in substantial competition with downtown Paramount.

The question arises whether or not the runs and clearances were reasonable as to such theatres in substantial competition. It is difficult to define "substantial competition." What is the yard-stick to be used? What bounds the term "substantial competition?" Who is to decide what is "substantial competition"—each individual distributing company? Some Board? Or the courts?

Substantial competition is also something which may change from year to year; and substantial competition in Los Angeles, where transportation depends primarily upon the individual automobile, may be entirely different from substantial competition in New York or Chicago. From how far distant does Paramount Downtown Theatre draw its attendance? Does it depend for patronage upon those who drive into downtown Los Angeles by automobile, or the commuter who comes into Los Angeles by interurban, or upon those who live in the downtown area? Population, ease of transportation, accessibility, et cetera, may determine to a great extent "substantial competition."

It is agreed that within a limited area Partmar should be protected as to runs and clearances, but where that area ends depends upon many factors. There is no contention that any other theatre within a radius of a few blocks of the Paramount Downtown Theatre should have the right to show the same Paramount films as exhibit-

ed by Partmar at the same time. Plaintiff's contention is, however, that the runs and clearances as established by the parties hereto are unreasonable, inasmuch as they extend out beyond the zone of substantial competition.

It has been assumed by the parties hereto that Partmar has an exclusive right to show Paramount Pictures first run in the metropolitan area of Los Angeles. But it should be pointed out that nowhere in the agreement is the word "exclusive" used. It may be that the parties have interpreted the agreement to be an exclusive agreement but, if they have, they have read into the contract something which does not specifically appear there. It is Paramount's contention that Partmar has insisted it has an exclusive, first-run right in the Los Angeles metropolitan area, and it may be that Paramount has acceded to such interpretation of the franchise agreement. The parties may have interpreted the contract to be an exclusive contract when, in fact, it is not.

Where there is a restricted community, whether rural or urban, in which there is more than one theatre, one theatre certainly must be given preference over the others. Neither the theatre owner, producer, nor distributor would want their pictures shown simultaneously in two theatres adjacent to or across the street from each other. The theatre owners themselves wish to have the right to show a picture first within a given community. As a result the distributor must determine which theatre is to have prior right. We do not believe that any motion picture theatre, without a contract to the contrary, is privileged to demand as a matter of right first-run privilege on any particular picture. It seems to the Court that the distributing company should have the right, where competition exists, to determine for itself which theatre shall have prior right to its pictures. This determination on the part of the distributor might depend upon several things—location, size of theatre; whether or not it is a new or an old installation, modern conveniences, and management. A motivating force in the motion picture business is income, and the distributor, all other things being equal, will give the right of showing pictures to the theatre likely a produce the greatest revenue.

During the past few years there seems to have developed within the motion picture exhibitors' industry the idea that any theatre had the right to demand prior runs. As a result, when prior runs have not been made available, they have applied to the courts for enforcement of that so-called right.

We are not of the opinion that any theatre has the right, as a matter of law, to demand from a motion picture producer the right of prior runs, any more than the seller of automobiles has the right to demand of the manufacturer an agency within a restricted territory. If the automobile manufacturer has the right to establish an exclusive agency within a restricted area for the sale of its product and to refuse to license any other agency within that restricted area, it would seem to the Court that the motion picture distributor should have the same right and privilege.

In Federel Trade Commission v. Raymond Bros.-Clark Company, 263 U.S. 565, 44 S.Ct. 162, 164, 68 L.Ed. 448, the Circuit Court of Appeals held that the Raymond Company had the lawful right to select any particular merchandise which it wished to purchase and to select any person or corporation from whom it might wish to make its purchase and that it also had the unquestioned right to discontinue dealing with any manufacturer. The Commission contended that the conduct of the Raymond Company, acting alone and not in combination with others, constituted an unfair method of competition, but the Court said:

"It is the right, 'long recognized,' of a trader engaged in an entirely private business, 'freely to exercise his own independent discretion as to the parties with whom he will deal.' * * *

"A different case would of course be presented if the Raymond Company had combined and agreed with other wholesale dealers that none would trade * * *. An act lawful when done by one may become wrongful when done by many acting in concert, taking on the form of a conspiracy * * *."

The Supreme Court sustained the Circuit Court.

In the case at bar there is no proof of conspiracy. Webster's New International Dictionary, Second Edition, defines conspiracy as follows: "conspiracy (3). Law. An agreement, manifesting itself in words or deeds, by which two or more persons confederate to do an unlawful act, or to use unlawful means to do an act which is lawful; * * *." If the franchise agreement in question had been brought about because of an understanding among production companies or because of an agreement with the exhibitors, we could then understand how it might be said that the contract was an agreement based upon conspiracy; but there is no evidence to indicate that any third party conspired with either Paramount or Partmar to bring into existence the franchise agreement.

If the parties to the franchise agreement had combined to restrain freedom of interstate commerce in the transportation, sale or exhibition of motion pictures, the position of plaintiff that the franchise agreement is void might be tenable, but the evidence in this case does not indicate in any manner that the franchise agreement interfered in any way with the freedom of interstate commerce.

In the absence of conspiracy, a minimum price agreement is lawful in California. The evidence in this case shows at most nothing more than one agreement on admission prices between one film company and one exhibitor, applicable to one theatre. There is nothing to indicate that the admission prices set were the same as those used by other theatres and no evidence to indicate a conspiracy between exhibitors and producers to maintain minimum prices at any number of theatres. At most it was an agreement affecting only one theatre.

If plaintiff had established by competent evidence that the prices as set forth in the franchise agreement were, in general, uniform and used by other theatres as the result of a price fixing agreement by the film companies or the exhibitors, there would be some basis for the Court to sustain plaintiff's contention. However, a single contract between one film company and one exhibitor is not violative of the Sherman Act.

In Binderup v. Pathe Exchange, 263 U.S. 291, at page 312, 44 S.Ct. 96, at page 100, 68 L.Ed. 308, the Court said: "It is doubtless true that each of the distributors, acting separately, could have refused to furnish films to the exhibitor without becoming amenable to the provisions of the act, * * *. The illegality consists, not in the separate action of each, but in the conspiracy and combination of all to prevent any of them from dealing with the exhibitor."

In discussing resale prices, the Court said in John D. Park & Sons Co. v. Hartman, 6 Cir., 153 F. 24, at page 37, 12 L.R.A., N.S., 135: "Each [case—Elliman & Sons v. Carrington, etc., L.R. 1901, 2 Ch. Div. 275, and Garst v. Harris, 177 Mass. 72, 58 N.E. 174] involved only a single transaction by which the article was sold upon an agreement that the purchaser would not resell at less than a named price. Neither concerned any other rights than those of the contracting parties, and neither decides more than that an agreement of sale of a chattel by which the purchaser agrees that he will not sell below a certain price is valid and not such a restraint of trade as to be obnoxious to the law."

In United States v. Paramount, 334 U.S. 131, 68 S.Ct. 915, 922, 92 L.Ed. 1260, the Court dealt with not a single contract on admission prices but with a system of such contracts to "regiment an entire industry" on admission prices.

In Federal Trade Commission v. Curtis Publishing Company, 260 U.S. 568, 43 S.Ct. 210, 67 L.Ed. 408, the Commission contended that Curtis Publishing Company was violating the Clayton Act because it entered into contracts with its distributers in which the distributers agreed to refrain from selling or distributing certain competitor publications and agreed to maintain prices as established by the Curtis Publishing Company.

The Supreme Court held that there was not sufficient evidence to show that the respondent intended to practice unfair methods or unduly to suppress competition or to acquire a monopoly, saying, 260 U.S. at page 582, 43 S.Ct. at page 213: "The

mere selection of competent, successful and exclusive representatives in the orderly course of development can give no just cause for complaint, and, when standing alone, certainly affords no ground for condemnation under the statute."

Again the Court said, in United States v. General Electric Co. et al., D.C., 15 F.2d 715, 717: It must "be conceded that he [the manufacturer] may fix the price at which he will sell, and may select the agents whom he wishes to represent him, and may fix the price at which these agents may sell the principal's goods."

In Coca-Cola Bottling Co. v. The Coca-Cola Co., D.C., 269 F. 796, the defendant contended that a contract entered into by the parties was in restraint of trade and pointed out certain covenants of the contract to substantiate his position.

The Court said, 269 F. at page 815: " * * * It is unnecessary to analyze the several covenants pointed out as being in unreasonable restraint of trade. Those covenants at most operate as a partial and not as a general restraint, and are 'merely ancillary to the main purpose of a lawful contract, * * *.' "

In regard to block booking, it does not appear to this Court that the franchise agreement as entered into between the parties comes within the meaning of "block booking" as defined by the Supreme Court, which has described the term as "the practice of licensing, or offering for license, one feature or group of features on condition that the exhibitor will also license another feature or group of features released by the distributors during the given period." U. S. v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 928, 92 L.Ed. 1260.

There is nothing to show that Partmar obtained a license for any particular picture with the understanding that it would also have to license other pictures. The franchise agreement discloses that Partmar was to have Los Angeles first-run rights on *all* pictures produced by Paramount; and there is no evidence to indicate this right depended upon the taking of any particular feature picture. The fact of the matter is that neither Paramount nor Partmar knew from year to year what feature pictures were to be available for exhibition. The evidence discloses that on many occasions Partmar did not show Paramount Pictures for the first time in Los Angeles, as such pictures were shown either under a pre-release agreement, a road show contract or by other exhibitors.

From the foregoing, we are constrained to hold the franchise agreement is not in itself an illegal agreement; consequently, plaintiff had no right to cancel or terminate it because of illegality.

Inasmuch as plaintiff had no right to terminate or cancel the franchise agreement, it had no right to terminate or cancel the lease and has thus failed to establish its right to maintain this action in unlawful detainer.

Plaintiff's claim for damages must also fall because it has not sustained its contention that is was entitled to terminate the lease and demand a return of the theatre.

Defendant filed an answer to plaintiff's complaint, which answer contained three counter-claims:

1. For excessive charges for pictures.
2. For excessive theatre rental.
3. For over-payment of theatre rental.

Subsequently a further counter-claim was added by amendment, alleging that as a part of the conspiracy Paramount required Partmar to make payment for short-subject motion pictures which Partmar did not need and did not use.

At the time of trial it was agreed that action on the counter-claims should be postponed until after the trial of the main issue involved, and no evidence was offered by either plaintiff or defendant on the counter-claims.

It appears that all of the counter-claims, with the exception of the third counter-claim, are based upon conspiracy. As we find no substantial evidence of a conspiracy in this case on the part of Partmar or Paramount, we are of the opinion that the counter-claimant cannot recover upon the first, second and fourth counter-claims. Therefore, it will not be necessary to take evidence on such counter-claims.

By its third counter-claim defendant has alleged there was an overpayment of rent made to the plaintiff on behalf of defendant in the sum of $10,666.71.

In its third cause of action plaintiff alleges Paramount made a loan to Partmar in the sum of $28,000, evidenced by a promissory note executed by Partmar; that said note has fully matured and there is an unpaid principal balance of said note to April 1, 1947, in the sum of $12,000, together with interest thereon at the rate of 2% per annum from September 1, 1946.

No disposition is now made by the Court of either the third cause of action of plaintiff's complaint or the third counter-claim as set forth by the defendant. Trial on the third cause of action and the third counter-claim will be had at some future date.

Findings in conformity with this memorandum of opinion will be prepared by defendant.