**FANCHON & MARCO, Inc., and Paramount Hollywood Theatre Corporation, Plaintiffs,**

v.

**PARAMOUNT PICTURES, Inc., Defendant,**

and

**American Broadcasting-Paramount Theatres, Inc., Defendant-Intervenor.**

United States District Court
S. D. New York.

Aug. 15, 1955.

---

2. Immigration and Nationality Act 1952, 8 U.S.C.A. § 1482.

3. Immigration and Nationality Act 1952, 8 U.S.C.A. § 1101(a) (33).

John Harlan Amen, New York City, for plaintiffs, Russell Hardy, Sr., and Russell Hardy, Jr., Washington, D. C., of counsel.

Simpson, Thacher & Bartlett, New York City, for defendant and defendant-intervenor Albert C. Bickford, George G. Gallantz, William J. Manning and Robert W. Bjork, Thomas R. Farrell, Jr., New York City, of counsel.

DAWSON, District Judge.

This is an action tried by the Court without a jury wherein Fanchon & Marco, Inc. (hereinafter called "Fanchon & Marco"), as a 50% stockholder of Paramount Hollywood Theatre Corporation (hereinafter called "Paramount Hollywood") seeks, on behalf of Paramount Hollywood, treble damages and injunctive relief under the anti-trust laws, 15 U.S.C.A. §§ 1, 2, 15, against Paramount Pictures, Inc. (hereinafter called "Paramount") and wherein the defendant-intervenor, American Broadcasting-Paramount Theatres, Inc. (hereinafter called "AB–PT") by a counterclaim seeks declaratory judgment that it is a 50% stockholder in Paramount Hollywood and seeks an injunction against interference with its rights.

### Proceedings Prior to Trial

Originally, the complaint named as plaintiffs (1) Paramount Hollywood, suing in its own right for treble damages and injunctive relief, (2) Fanchon & Marco, suing derivatively as a stockholder of Paramount Hollywood for the same damages and other relief which was sought by Paramount Hollywood, and (3) Fanchon & Marco, suing in its own right for the identical damages and relief.

The District Court directed a dismissal of the amended complaint with leave to Fanchon & Marco, suing on its own behalf, to serve a second amended complaint consistent with the views expressed in its opinion. 107 F.Supp. 532. Fanchon & Marco elected not to amend and the District Court, by order dated February 6, 1953, entered final judgment dismissing all of the claims alleged in the amended complaint. On appeal, the Court of Appeals reversed as to the claim which Fanchon & Marco alleged derivatively on behalf of Paramount Hollywood and allowed that claim to stand and remanded the action for further proceedings consistent with its opinion. It affirmed, however, the dismissal of the action asserted in the name of Fanchon & Marco on its own behalf and the action asserted directly in the name of Paramount Hollywood, the latter on the ground that Paramount Hollywood had never authorized the bringing of a suit in its name. 2 Cir., 202 F.2d 731.

Only the derivative right of action remained for trial. After remand, the District Court held extensive pretrial conferences and entered a pre-trial order which, among other things, defined the issues to be tried.

### The Issues

The amended complaint is framed exclusively on alleged violations of the anti-trust laws. It is not a suit for breach of contract. See Leibell, J., at 107 F.2d 542 and 548. Fanchon & Marco was afforded an opportunity to apply for leave to amend the amended complaint to assert any claims not based on the anti-trust laws, but elected not to do so. 202 F.2d at page 733.

Therefore, the issues framed in the pre-trial order which must, in the absence of modification, control the subsequent course of the action, Calendar Rule 18, S.D.N.Y., are, except for the counterclaim, framed on the basis that the action is solely a derivative one for violation of anti-trust laws and for the damage to Paramount Hollywood alleged to have resulted therefrom.

The primary issue framed in the pretrial order is issue (1A) in Paragraph 8 which reads:

"(1A) Was there a conspiracy on October 22, 1941, and for many years theretofore, among Paramount Pictures, Inc. and other corporations engaged in the production, distribution and exhibition of motion pictures (a) to restrain and monopolize for Paramount, its subsidiaries and said other corporations engaged in interstate trade and commerce, the distribution and exhibition of feature motion pictures, including the first-runs thereof in Hollywood and Los Angeles, and (b) to exclude all other persons therefrom except on terms and conditions fixed and established by the parties to the alleged conspiracy?"

All other issues set forth in the pretrial order (except insofar as they relate to the cause of action asserted by the defendant-intervenor for declaratory judgment) stem from this main issue.

### The Facts

Paramount Hollywood is a corporation which was formed in 1942 by Fanchon & Marco and Paramount to lease and operate the Paramount Hollywood Theatre in Hollywood, California. Fanchon & Marco is a company which has been engaged in the business of operating motion picture theatres directly or through affiliated companies for many years. It operates, directly or through affiliates or subsidiaries, approximately forty motion picture theatres.

The defendant Paramount was engaged in the production and distribution of motion pictures and in the exhibition of motion pictures through subsidiary or affiliated companies.

In 1933, a subsidiary of Paramount which owned the Paramount Downtown Theatre in Los Angeles leased that theatre to a wholly-owned subsidiary of Fanchon & Marco, known as Partmar Corporation, and simultaneously entered into a franchise agreement with Partmar by which Paramount licensed Partmar to exhibit Paramount pictures at the Paramount Downtown Theatre and which required Partmar to exhibit feature pictures released by Paramount. The Paramount Downtown Theatre was thereafter operated as a "first run" theatre for Paramount pictures in Los Angeles.

In 1941, both Fanchon & Marco and Paramount wished to open a new first run theatre for Paramount pictures in Hollywood. Most of the other major motion picture distributors were at that time distributing their pictures for simultaneous first run in downtown Los Angeles and also in Hollywood.

On October 22, 1941, Fanchon & Marco and Paramount entered into a contract which, among other things, provided for the opening of a theatre in Hollywood to be operated by a corporation owned jointly and equally by Paramount and Fanchon & Marco and which was to be managed by Fanchon & Marco. Pursuant to this contract, Paramount Hollywood was formed as a Delaware corporation in February of 1942. Fanchon & Marco and Paramount each contributed one-half of the money capital and each received one-half of the stock and each was given equal representation on its Board of four Directors.

Paramount Hollywood Theatre opened under the management of Fanchon & Marco on March 18, 1942. Following the opening of the theatre and pending negotiation and execution of a franchise, Paramount supplied certain first run pictures for exhibition at the theatre, pursuant to agreements made from time to time between Paramount and Paramount Hollywood. The franchise was finally executed by Paramount and Paramount Hollywood on September 5, 1944, after negotiations in which Fanchon & Marco and its counsel participated. This franchise was made retroactive to March 18, 1942 and by its terms, was to expire on September 30, 1951.

The franchise provided, among other things, that Paramount would license pictures to Paramount Hollywood and that Paramount Hollywood would exhibit

at its theatre such number of feature photoplays so licensed "as shall be necessary to consume not less than forty-six (46) weeks of playing time" at the theatre during each release year, and that Paramount Hollywood would not exhibit feature photoplays other than those so licensed for more than two consecutive weeks during any month of the release year. The franchise provided that the terms and conditions, including license fees, were to be agreed upon by the parties on or before August first next preceding the beginning of each release year, but if agreement could not be reached, the disagreement should be settled by arbitration, provided that in such arbitration, the terms so fixed should not be less favorable to Paramount than those in effect in the preceding year.

A management agreement between Fanchon & Marco and Paramount Hollywood was executed February 24, 1942 under which Fanchon & Marco was employed to manage the theatre for a fee of 5% of the gross receipts, which fee was increased in 1944. In 1944, an agreement was entered into between Paramount Hollywood and Paramount Theatre Service Corporation, a wholly-owned subsidiary of Paramount, with the full approval of Fanchon & Marco, pursuant to which the Service Corporation was employed to render services to Paramount Hollywood for an agreed compensation of $175. per week.

In 1945, Paramount and Fanchon & Marco were desirous of opening another first run theatre in the Los Angeles area and as a result of negotiations which took place, and with the approval of both of the stockholders of Paramount Hollywood, that corporation acquired certain land in the Beverly Hills section of Los Angeles with a view toward erecting a new theatre thereon. Before construction had commenced, but after preliminary plans had been drawn up by an architect, the United States District Court for the Southern District of New York, in an anti-trust action brought by the government against various motion picture companies, United States v. Paramount Pictures, Inc.,[1] entered a decree dated December 31, 1946, 70 F.Supp. 53, which decree prohibited Paramount from thereafter acquiring any theatre interests, either directly or through a corporation in which it held a substantial stock interest, and likewise enjoined Paramount from performing any existing franchises. Paramount thereupon informed Fanchon & Marco and Paramount Hollywood that in the light of this decree, it could not consent as a stockholder of Paramount Hollywood to the erection by it of the new proposed theatre in Beverly Hills. Paramount proposed as alternatives either that the land be sold and the proceeds divided or that the land be divided so that each could build a theatre, or that Paramount might sell its stock in Paramount Hollywood to Fanchon & Marco and that Paramount Hollywood could then build a theatre and perhaps lease it to Paramount. Fanchon & Marco refused to accept any of these alternatives and as a 50% stockholder of Paramount Hollywood, refused to permit Paramount Hollywood to accept any of them.

In the light of the injunction against performance of franchises contained in the decree of this Court of December 31, 1946, Paramount notified Paramount Hollywood on March 26, 1947 that it terminated the franchise agreement of September 5, 1944, effective March 31, 1947. Thereafter, Paramount continued to offer pictures for exhibition at Paramount Hollywood and actually supplied most of the pictures used by the theatre between March 31, 1947 and March 31, 1949 on terms which were negotiated and agreed to between Paramount and Paramount Hollywood, which terms were no less favorable than those prevailing be-

1. D.C.1946, 66 F.Supp. 323, D.C.1946, 70 F.Supp. 53, reversed and remanded in part, 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, D.C.1949, 85 F.Supp. 881, affirmed Warner Bros. Pictures v. United States, 1950, 339 U.S. 974, 70 S. Ct. 1032, 94 L.Ed. 1380.

fore the notice of termination of the franchise.

## Contentions of the Plaintiff

The rambling brief of the plaintiff and the apparent inability or unwillingness of its counsel at the trial to state with precision the basis upon which it contended that the acts of Paramount violated the anti-trust laws makes it difficult to express exactly the grounds upon which the plaintiff thinks that it is entitled to relief in this action.

It appears to be the position of the plaintiff that if Paramount Hollywood had not been restricted under the franchise to showing Paramount pictures for 46 weeks in the year, it could have obtained pictures from other distributors which would have had a larger audience appeal and so improved its revenues. The President of Fanchon & Marco stated that it was impossible successfully to run a motion picture theatre with pictures from only one distributor. He admitted that the theatre got the "cream" of the Paramount pictures, but contended that successfully to operate a theatre, it was necessary to get pictures from other distributors. The plaintiff contended that Paramount could not supply it with enough "A" pictures to let the theatre make as much profit as it should. However, counsel for plaintiff stated frankly: "We do not contend that this enterprise did not make a profit, and from a certain standpoint it made a good profit."

The testimony was uncontradicted that the inability of Paramount Hollywood to get pictures from other distributors was the result of the franchise agreement which it had voluntarily signed, with the consent of both its stockholders, and not the result of any conspiracy between the producers. There was affirmative testimony that other producers were ready to sell their pictures to theatres which were primarily showing Paramount films, and that there was no arrangement or understanding between Paramount and other distributors which, in the absence of the franchise, would have prevented Paramount Hollywood from getting pictures from other producers.

Furthermore, the franchise was terminated after approximately two years and seven months. But thereafter Paramount Hollywood, which was free to get pictures from any producer, bought principally Paramount pictures. There was no proof that there was any conspiracy to prevent it from getting other pictures at that time or that it did any better financially than in the period of the franchise.

It cannot be said that the franchise agreement was illegal per se. The United States Supreme Court so held in United States v. Paramount Pictures, 1948, 334 U.S. 131, at page 156, 68 S.Ct. 915, 92 L.Ed. 1260. See also Paramount Pictures Theatre Corporation v. Partmar, D.C.S.D.Cal.1951, 97 F.Supp. 552, at page 561, affirmed 9 Cir., 1952, 200 F.2d 561; affirmed 1954, 347 U.S. 89, at page 102, 74 S.Ct. 414, 98 L.Ed. 532.

The most that can be said about the franchise agreement is that Paramount Hollywood wanted a first option on Paramount pictures for first run and that as a condition of getting this option, it was willing to agree that it would show only Paramount pictures for 46 weeks of the year. Whether such an agreement was desirable or undesirable from a business standpoint is not before this Court. Whether the theatre would have made a greater or less profit with another business arrangement is not before this Court. Whether Paramount charged excessive license fees, which, of course, could have been arbitrated by plaintiff if it considered them excessive, is not before this Court. Whether Paramount breached the contract by failing to provide pictures of the quality which it should have provided under the contract is not before this Court. Any such claims would involve causes of action which could have been brought in a proper forum and do not arise under the anti-trust laws.

Plaintiff seems to contend, in the second place, that Paramount Theatre

Service Corporation did not provide the services which it was supposed to provide under the contract and that, therefore, the monthly stipend paid to it was excessive. If the Service Corporation did not perform its contract, relief could have been sought in an appropriate action. It it not a cause of action which arises under the anti-trust laws, in the absence of proof that the contract was the result of any conspiracy or monopoly.

Plaintiff may also be contending that Fanchon & Marco did not have an opportunity to open a first run theatre in Hollywood, except by allowing Paramount to own 50% of the stock of the theatre and by agreeing to enter into the franchise agreement and service contract hereinbefore referred to. It must, however, always be kept in mind that this is not a suit for the benefit of Fanchon & Marco, but a suit for the benefit of Paramount Hollywood, which only came into existence after the fifty-fifty stock arrangement had been entered into and after an understanding had been reached that it was to operate as a first run Paramount Theatre.

However, even if the contention above mentioned could be advanced on behalf of Paramount Hollywood, it would still leave the question as to whether the plaintiff had established that the condition of which it complained was the result of a conspiracy or monopoly which violated the anti-trust laws.

■ The mere fact that Paramount was willing to enter into a franchise agreement for a first run theatre in Hollywood only upon condition that it owned 50% of the stock would not be a violation of the anti-trust laws unless plaintiff established that Paramount was a party to a conspiracy to monopolize or restrain commerce in the Los Angeles area by means of such agreements. Chief Judge Clark has well pointed out in Fifth and Walnut v. Loew's Inc., 2 Cir., 1949, 176 F.2d 587, at page 590, certiorari denied 1949, 338 U.S. 894, 70 S.Ct. 242, 94 L.Ed. 549:

"* * * The condemnation of joint interests in the decision in United States v. Paramount Pictures, Inc., D.C.S.D.N.Y., 70 F.Supp. 53, is not to be regarded as a declaration that joint ownership as such is illegal. It was made in a suit between the United States and various distributors and exhibitors on the basis of the particular facts of that case, and the presence of some of the defendants in the two actions did not relieve the plaintiffs in the present action from the necessity of satisfying the jury that a conspiracy existed. Of course, no one could reasonably contend that every joint ownership of a theatre, irrespective of all surrounding circumstances, is a violation of the Sherman Antitrust Act; and no such decision has ever been made. * * *"

■ When called upon for proof that the conditions of which plaintiff complained were the result of a conspiracy, counsel for plaintiff replied repeatedly that the only proof was the Paramount decree of March 3, 1949. Although there may be question as to whether such a consent decree constitutes any evidence at all under § 5 of the Clayton Act, 15 U.S.C.A. § 16, this Court, since the trial was without a jury, received the decree into evidence. Plaintiff's attorneys urge that the Court should also consider the findings in the 1946 decree. This decree was not offered in evidence and, in any event, it would not have been admissible since it was not a "final" decree within the meaning of § 5 of the Clayton Act. Fifth and Walnut v. Loew's Inc., supra. See Duluth Theatre Corporation v. Paramount Pictures, D.C.Minn.1947, 72 F. Supp. 625; Antitrust Enforcement by Private Parties, 61 Yale L.J. 1010, at p. 1040 (1952).

However, neither the decree of 1949 nor the previous findings establish that there was a conspiracy in the Los Angeles area which would have prohibited a theatre from operating as an independent first run theatre or from obtaining

pictures from various producers or which would have required a theatre to enter into a restrictive franchise or enter into a service agreement as a condition of getting first run pictures.[2] To establish that there was a conspiracy in the Los Angeles area which would have brought about such a result would have required more evidence than the mere submission of the 1949 Paramount decree. Theatre Enterprises, Inc., v. Paramount Film Distributing Corp., 1954, 346 U.S. 537, 543, 74 S.Ct. 257, 98 L.Ed. 273; Twentieth Century-Fox F. Corp. v. Brookside Th. Corp., 8 Cir., 1952, 194 F.2d 846, 853, 854, certiorari denied 1952, 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348; Dipson Theatres v. Buffalo Theatre, 2 Cir., 1951, 190 F.2d 951, 957, certiorari denied 1952, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 691; see Sun Theatre Corp. v. RKO Radio Pictures, 7 Cir., 1954, 213 F.2d 284, 290.

Considerable law on the subject has been developed out of the prolific litigation heretofore instituted by Fanchon & Marco under the anti-trust laws. In Fanchon & Marco v. Paramount Pictures, D.C.S.D.Cal.1951, 100 F.Supp. 84, certiorari denied 1953, 345 U.S. 964, 73 S.Ct. 950, 97 L.Ed. 1383, affirmed 9 Cir., 1954, 215 F.2d 167, certiorari denied 1955, 348 U.S. 912, 75 S.Ct. 293, the plaintiff, Fanchon & Marco, which operated the Baldwin Theatre in Los Angeles, brought an anti-trust action against various motion picture producers, distributors, and exhibitors for damages and for an injunction based upon claims that the defendants monopolized first run motion pictures in Los Angeles and deprived plaintiff of first run motion pictures. The District Court properly found that before the plaintiff could recover, the Court must first be satisfied that the practices of which the plaintiff complained were the result of joint action and were unreasonable. It found that the practices were not a result of joint action nor were they unreasonable. The Court of Appeals in affirming said, after reviewing the record:

"* * * The pattern of licensing used in the industry as a whole and in the Los Angeles area was lawful. It would become illegal only if set up by concert of action and was unreasonable. * * *

"The impression gathered from the whole of the record is that of a highly competitive industry, in which the managers of appellant took an active part and indeed profited from some of the situations of which they now complain. It was only when appellant found the same conditions operated against it as well as in its favor and when its vociferous demands that economic law be repealed in its favor were disregarded, that suit was commenced." 215 F.2d at page 170.

In Paramount Pictures Theatre Corp. v. Partmar, D.C.S.D.Cal.1951, 97 F.Supp. 552, affirmed 9 Cir., 1952, 200 F.2d 561, affirmed 1954, 347 U.S. 89, 74 S.Ct. 414, 421, 98 L.Ed. 532, Partmar, a wholly-owned subsidiary of Fanchon & Marco, resisted a suit by Paramount to regain possession of the Paramount Downtown Theatre. Partmar and Fanchon & Marco cross-claimed against Paramount alleging that the conspiracy which the Court had found in United States v. Paramount had resulted in the imposition of excessive terms and conditions on Partmar by the lease and franchise which it had entered into, i. e., in requiring Partmar Corporation to license for exhibition at that theatre for 46 weeks in each year only pictures released by Paramount and by imposing excessive terms and conditions and charges for the pic-

---

**2.** The United States Supreme Court said with reference to the 1946 decree:

"* * * * there is no finding as to the presence or absence of monopoly on the part of the five majors in the *first-run* field for the entire country, in the *first-run* field in the 92 largest cities of the country, or in the *first-run* field in separate localities. * * *" United States v. Paramount Pictures, 1948, 334 U.S. 131, at page 172, 68 S.Ct. 915, at page 936.

tures, and by requiring Partmar to pay to Paramount 50% of the net receipts from the theatre. The District Court found that neither the lease nor the franchise was the result of any combination or conspiracy of any kind whatsoever in violation of the anti-trust laws. The Supreme Court, in affirming, said:

"Nor would unlimited admission in evidence of the final decree in United States v. Paramount Pictures, Inc., supra, have aided Partmar. * * * From the decree there would have been prima facie evidence of a conspiracy but no evidence that the Partmar lease was a result of that conspiracy so as to overturn the trial court's finding in this very proceeding that no illegality tainted the lease."

■ In the present case, counsel for the plaintiff was repeatedly asked what proof he had of an illegal combination or conspiracy causing the result of which he complained, and he replied that he relied principally upon the judgment in United States v. Paramount.[3] But as the Supreme Court has said, that final judgment could not be sufficient to establish that the matters of which plaintiff complained resulted from the conspiracy found in United States v. Paramount. There was no other competent evidence to show that the original agreement for the formation of Paramount Hollywood or the division of its stock or the franchise agreement or the service agreement with the Service Corporation were the result of a combination or conspiracy with any other parties or a monopoly in violation of the anti-trust laws. In fact, the evidence was quite to the contrary.

Plaintiff also seems to contend, in the third place, that when Paramount, as a 50% stockholder of Paramount Hollywood, refused in 1946 to continue with plans to have that corporation build another theatre in Beverly Hills, this refusal constituted a violation of the anti-trust laws. Nowhere in the case was there any evidence presented that Paramount had conspired not to erect other theatres in the Los Angeles area. In fact, the evidence is distinctly to the contrary. From 1944 until the end of 1946, Paramount was actively urging Paramount Hollywood to go ahead with the construction of a new theatre in Beverly Hills. But when the decree of this Court in United States v. Paramount was entered on December 31, 1946, which enjoined Paramount from "jointly owning motion picture theatres * * * with independents through stock interests in theatre buildings" 70

---

3. The following colloquies by the Court and plaintiff's counsel are illustrative:

"The Court: Mr. Hardy, I think we have the picture now of what they said was injurious to their business. Now I want to find out how that was the result of any conspiracy between Paramount and others.

"Mr. Hardy: Well, if your Honor please, we rely largely and must rely largely upon the judgment in the Paramount case." (S.M. p. 567)

"The Court: Now all of the evidence from people who have been here, except the people representing the plaintiff, is that they had a free market in pictures, and they might perfer to put them in a theatre owned by themselves, or something of that nature, but that is not an indication that there was a conspiracy to deprive this theatre of an opportunity to get first-run pictures. As a matter of fact, if the company had not entered into this agreement with Paramount Pictures whereby it agreed that Paramount should have the right to have its pictures run 46 weeks of the year, I suppose they would have been perfectly able to go out and say to other companies, 'Will you sell us pictures?' Maybe they wouldn't, but the fact that they wouldn't is not sufficient unless you can prove that there was a combination between the companies, which was a violation of the anti-trust laws in this particular area with reference to this particular theatre.

"Mr. Hardy: It is my contention, your Honor, that if we shall succeed in introducing the judgment [in United States v. Paramount] and the findings of fact, we are certainly well on our way to establishing that, and I am frank to say that I have some doubt as to whether I shall be able to do so without that. * * *" (S.M. pp. 624–626)

848

F.Supp. at page 72, Paramount understandably did not wish to go ahead with the erection of a new theatre which might run afoul of this decree. As a business decision, it decided, as a stockholder of Paramount Hollywood, not to go along with any plan for erecting a new theatre. It suggested dividing the land in Beverly Hills so that Fanchon & Marco could erect a separate theatre—which certainly did not seem to indicate a desire to restrict competition—but Fanchon & Marco refused. The course of conduct of Paramount in this matter was certainly not evidence of a violation of the anti-trust laws, nor was there any proof that it was the result of any combination, conspiracy or monopoly. While the Sherman Act may be designed to promote competition, it does not require that a party commit contempt of Court in order to promote competition.

### The Counterclaim of the Intervenor

The intervenor, AB–PT, by a counterclaim, seeks a judgment that it is the lawful owner of the Class B stock of Paramount Hollywood, constituting 50% of the outstanding stock of the company. These shares were issued to Paramount at the time of the organization of Paramount Hollywood. The certificate of incorporation of Paramount Hollywood contained a section which provided, in substance, that Paramount could not dispose of or transfer these shares until it shall first have tendered such stock for sale to the stockholders holding the Class A stock (Fanchon & Marco) at the same price at which Paramount had received an offer from any stockholder not a stockholder of the "B" stock. This section provided, however, that Paramount might transfer these shares to "any corporation to which substantially all of the business and assets, or substantially all of the theatre exhibition business and assets (including shares of stock in theatre operating or holding corporations), of Paramount Pictures Inc. shall be transferred."

The consent decree of this Court dated March 3, 1949, as modified by an order dated December 15, 1949, in United States v. Paramount Pictures, Inc., provided in Section V–A as follows:

"The defendant, Paramount Pictures Inc., is ordered to effect the divorcement of its theatre assets located in the United States from its other assets by transferring on or about December 31, 1949, or as soon thereafter as practicable but in no event later than March 3, 1950, such theatre assets to the New Theatre Company and such other assets to the New Picture Company and thereafter to dissolve."

Pursuant to the direction in this decree, Paramount endorsed the shares of stock which it held in Paramount Hollywood to the "New Theatre Company" —AB–PT—and delivered the shares to Paramount Hollywood for transfer on the books of that corporation. The transfer was made about December 30 or 31, 1949, and a new certificate in the name of AB–PT was issued on or about January 3, 1950.

The President and Treasurer of Paramount Hollywood who were elected by Fanchon & Marco, as the holder of the Class A shares, have refused to recognize the transfer of such stock on the books, have refused to recognize AB–PT as a stockholder, or to allow such stockholder to elect directors of the corporation or to have access to the books of account of Paramount Hollywood and have attempted to take action on behalf of Paramount Hollywood without notice to, or consultation with, the Class B stockholders or directors nominated and elected by AB–PT. Fanchon & Marco appear to have taken the position that Paramount could not transfer the shares to AB–PT without first offering the shares to Fanchon & Marco and that, therefore, the transfer was void and that the only directors authorized to represent the corporation are those elected by Fanchon & Marco, thus disenfranchising the holders of the other 50% of the stock and taking to themselves the entire management and control of Paramount Hollywood.

Paramount has taken the position, in the first place, that the transfer of the shares to AB–PT was within the exception provided in the certificate of incorporation as a transfer to a corporation to which substantially all of the business and assets, or substantially all of the theatre exhibition business and assets, of Paramount have been transferred. The evidence, however, is that only interests in domestic theatres (i. e., in the United States) were transferred to the New Theatre Company. The interests in domestic theatres constituted on a "book net worth" basis on December 31, 1949 approximately 80% of the total investment of Paramount in its theatre exhibition business and assets. The number of theatres in which Paramount Pictures, Inc. had ,interests on December 31, 1949 in the United States was approximately 81% of the total number of theatres in which it had investment. Therefore, it transferred substantially 80% of its theatre assets to the New Theatre Company, which is now AB–Pt. 80% would not be "substantially all of the theatre exhibition business and assets". Burnet v. Bank of Italy, 9 Cir., 1931, 46 F.2d 629, certiorari denied 1931, 283 U.S. 846, 51 S.Ct. 493, 75 L.Ed. 1455; United States v. Cleveland P. & E. R. Co., 6 Cir., 1930, 42 F.2d 413; Wadhams & Co. v. United States, 1929, 67 Ct.Cl. 235; cf. Blue Ridge Lumber Products, Inc., v. Nelson, 2 Cir., 1954, 213 F.2d 451.

■ However, the transfer by Paramount to AB–PT of its stock in Paramount Hollywood was pursuant to a decree of this Court in an anti-trust proceeding and as such, it could not be impeded by any contract obligations. Continental Ins. Co. v. United States, 1922, 259 U.S. 156, 171, 42 S.Ct. 540, 66 L.Ed. 871; United States v. Southern Pac. Co., 1922, 259 U.S. 214, 234, 235, 42 S.Ct. 496, 66 L.Ed. 907; see Philadelphia B. & W. R. Co. v. Schubert, 1912, 224 U.S. 603, 613, 614, 32 S.Ct. 589, 56 L.Ed. 911; Federal Radio Comm. v. Nelson Bros. Co., 1933, 289 U.S. 266, 282, 53 S.Ct. 627, 77 L.Ed. 1166; Otis & Co. v. S. E. C., 1945, 323 U.S. 624, 638, 65 S.Ct. 483, 89 L.Ed. 511; New York Trust Co. v. S. E. C., 2 Cir., 1942, 131 F.2d 274, 276, certiorari denied 1943, 318 U.S. 786, 63 S.Ct. 981, 87 L.Ed. 1153; Sproles v. Binford, 1932, 286 U.S. 374, 390, 391, 52 S.Ct. 581, 76 L.Ed. 1167.

The transfer was one which Paramount had to make and when made, had to be recognized by Paramount Hollywood and Fanchon & Marco. The transfer was made and AB–PT is the registered owner of the stock. As such, it is entitled to have its rights as a stockholder recognized. The transfer was not one which was void. It therefore does not give Fanchon & Marco an excuse for disregarding the transfer or for assuming that it is the only stockholder of Paramount Hollywood entitled to elect directors or to participate in the management of the corporation. The attitude of Fanchon & Marco has been high-handed and without justification. If Fanchon & Marco believe that they have a contract right to acquire the stock now held by AB–PT, they could assert that right in a proper cause of action. They cannot, however, take the law into their own hands, disregard the transfer, disregard the rights of registered stockholders, and operate a company in disregard of the wishes or interests of the other 50% registered stockholder.

It may be pointed out that AB–PT, under the provisions of the decree of March 3, 1949, as modified by an order dated December 15, 1949, had to file with the Court its consent to be bound by certain of the requirement of the Paramount consent decree, one of which is that it must terminate the existing joint ownership of the Paramount Hollywood Theatre. The requirements of this decree that this joint interest be terminated has been stayed by an order of this Court dated March 7, 1951 until six months after final determination of this case. The order was made after notice to the plaintiffs in this case. Therefore, after final determination of this case, the joint interest of AB–PT and Fanchon & Marco in Paramount Hollywood will have

to be terminated, and at that time, any restrictions on the sale of stock now registered in the name of AB–PT will be binding and Fanchon & Marco can assert their rights to have the stock tendered to them in accordance with the provisions of the certificate of incorporation.

### Other Defenses of the Defendants

In view of the decision of the Court that plaintiff has not established a cause of action under the anti-trust laws, it becomes unnecessary to consider certain defenses of the defendants in which they urge that certain of the causes of action are barred by the Statute of Limitations and that the plaintiff is estopped to claim the existence of a conspiracy or monopoly in Los Angeles.

### Conclusion

1. Neither the defendant nor the defendant-intervenor has done anything forbidden by the anti-trust laws to the injury of Paramount Hollywood's business or property.

2. Paramount Hollywood is not entitled to recover any damages from the defendant or the defendant-intervenor, or either of them, and consequently Fanchon & Marco is not entitled, as a stockholder of Paramount Hollywood, to maintain this derivative suit against the defendant or the defendant-intervenor for such damages or for injunctive relief.

3. Defendant and defendant-intervenor are each entitled to judgment that Paramount Hollywood take nothing from them, or either of them, and that said defendant and defendant-intervenor recover their respective costs herein.

4. Defendant-intervenor is entitled to judgment that it is the registered and lawful owner and holder of 400 shares of the Class B stock of Paramount Hollywood Theatre Corporation.

5. Defendant-intervenor is likewise entitled to an injunction permanently restraining Fanchon & Marco and Paramount Hollywood, and their respective officers, directors, agents, servants and employees from interfering in any way with the proper exercise by the defend-

ant-intervenor of its rights as the owner and holder of said shares of stock in Paramount Hollywood.

The findings of fact and conclusions of law are being filed simultaneously with this opinion.